UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KARL STORZ ENDOSCOPY-AMERICA, INC., | Case No. 14-cv-00876-RS   (JSC) |
| Plaintiff, | **ORDER RE: MOTION TO RETAIN CONFIDENTIALITY DESIGNATIONS AND ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL** |
| v. | Re: Dkt. Nos. 164, 165, 171, 177 |
| STRYKER CORPORATION, et al., | |
| Defendants. | ~~*FILED UNDER SEAL*~~ |

In this patent infringement lawsuit Defendants Stryker Corporation and Stryker Communications, Inc. (together, "Stryker") move to retain the confidentiality designations of certain produced documents.  (Dkt. No. 165.)[1]  The parties' administrative motions to file under seal their briefing on that motion are also pending.  (Dkt. Nos. 165, 171, 177.)  Having considered the parties' submissions, and having had the benefit of oral argument on May 12, 2016, the Court GRANTS IN PART Stryker's motion to retain confidentiality designations and GRANTS the parties' administrative motions to file under seal.[2]

### BACKGROUND

Plaintiff Karl Storz Endoscopy-America ("KSEA") and Stryker are both producers and sellers of medical imaging devices and operating room communication technology.  (*See* Dkt. No. 67; Dkt. No. 94 at 3.)  KSEA alleges that Stryker has infringed five of its patents, numbered

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.  This Order cites the redacted, publicly-filed versions of the parties' submissions.

[2] The case has been referred to the undersigned magistrate judge to resolve discovery disputes. (Dkt. No. 99.)

8,069,420 (the "'420 Patent"), 7,471, 310 (the "'310 Patent"), 7,844,657 (the "'657 Patent"), and 8,439,821 (the "'821 Patent," and collectively, the "patents in suit"), which relate to camera technology and operating room integration technology.  (*See* Dkt. No. 1; Dkt. No. 67.)  The accused products include Stryker's SwitchPoint Infinity 3, SwitchPoint Element, SIDNE, and 1488 Camera System.

During the course of discovery, the parties entered a Protective Order to govern the exchange of information about the structure and operation of Stryker's allegedly infringing products.  (*See* Dkt. No. 115.)  The parties stipulated to all materials terms of the protective order save one: whether the order should include a patent prosecution bar, which the Court addressed in an Order in November 2014.  *See Karl Storz Endoscopy-Am., Inc. v. Stryker Corp.*, No. 14-cv-00876-RS (JSC), 2014 WL 6629431, at *1 (N.D. Cal. Nov. 21, 2014).  The Court concluded that Stryker had met its burden of showing good cause for the inclusion of a patent prosecution bar.  *Id.* at *3-4.  Specifically, the Court emphasized that Stryker had made a sufficient showing that KSEA's counsel, Wesley Whitmyer, Jr., is engaged in competitive decisionmaking for KSEA based on his participation in prosecuting the patents-in-suit and other related patents on similar subject matters for KSEA.  *Id.* at 3.

Pursuant to the Court's Order, the parties' Protective Agreement provides that "any individual who receives access to information marked 'HIGHLY CONFIDENTIAL – SUBJECT TO PATENT PROSECUTION BAR' shall not be involved in the prosecution of patents or patent applications relating to the subject matter of this action[.]"  (Dkt. No. 164-4 ¶ 8.)  The Protective Order further provides that "prosecution" includes "directly or indirectly drafting, amending, advising, or otherwise affecting the scope or maintenance of patent claims[,]" including participation in "original prosecution, reissue and reexamination proceedings."  (*Id.*)

The Protective Order thus provides three different levels of protection: "HIGHLY CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" label, and "HIGHLY CONFIDENTIAL – SUBJECT TO PATENT PROSECUTION BAR."  (*See generally id.*)  The Protective Order does not define what type of information should trigger each label—and thus, what information should trigger the prosecution bar.  Instead, the Court anticipated that if a

United States District Court
Northern District of California

2

United States District Court
Northern District of California

1    dispute were to arise over whether information in a particular document should trigger the bar, the

2    parties would follow the dispute resolution process set forth in the Protective Order.  *KSEA*, 2014

3    WL 6629431, at *4.  (*See* Dkt. No. 115 ¶ 6.2.)

4        With the Protective Order in place, Stryker has produced thousands of documents, many of

5    which are design files for the accused products that include confidential technical information

6    about proprietary software and technology.  (*See* Dkt. No. 165-2 ¶ 2; Dkt. No. 165-3 ¶ 2.)  KSEA

7    has restricted access to the prosecution bar documents to attorneys Benjamin C. White, Michael J.

8    Kosma, Michael A. Lavine, and Robert D. Kessler.  (Dkt. No. 172-1 ¶ 3; Dkt. No. 172-2.)  Mr.

9    Whitmyer has not accessed the designated materials.  In the meantime, Stryker contends, and

10   KSEA does not dispute, that Mr. Whitmyer continues to prosecute patent applications relating

11   directly to the subject matter of this action, including a continuation of the asserted '821 Patent

12   and others relating to products that control devices used during operations, video imaging, and

13   camera control.  (Dkt. No. 165 at 9 (record citations omitted).)

14       In any event, Stryker initially designated 285 documents subject to the prosecution bar.

15   (Dkt. No. 165-53; Dkt. No. 165-54.)  KSEA challenged the designation for 250 of them.  (Dkt.

16   No. 172-8; Dkt. No. 172-9.)  The parties engaged in fruitful meet and confer efforts to reduce the

17   number of disputed designations; during that time, Stryker removed the prosecution bar

18   designation from more than 200 of the challenged documents.  (Dkt. Nos. 165-48, 165-49, 165-50,

19   165-51,165-52.)  Ultimately, the parties reached an impasse regarding the prosecution bar

20   designations of 24 documents and portions thereof.  (Dkt. No. 172-11.)   The instant motion to

21   retain confidentiality designations followed.  (Dkt. No. 165.)

22   **I.      Motion to Retain Confidentiality Designations**

23           A.      <u>Legal Standard</u>

24       Federal Rule of Civil Procedure 26(c) "confers broad discretion on the trial court to decide

25   when a protective order is appropriate and what degree of protection is required."  *Seattle Times*

26   *Co. v. Rhinehart*, 467 U.S. 20, 36 (1984).  Generally, the party seeking a protective order has the

27   burden of showing protection is warranted.  *See Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 1122,

28   1130 (9th Cir. 2003).  So too with a prosecution bar: the party seeking a prosecution bar must

3

demonstrate good cause for its inclusion in a protective order, which involves showing that there is an unacceptable risk of disclosure of confidential information, and that the proposed prosecution bar is reasonable in scope. *See In re Deutsche Bank Trust Co. Ams.*, 605 F.3d 1373, 1381 (Fed. Cir. 2010).

"Any prosecution bar should serve only to mitigate the risk of inadvertent use of proprietary information by a patentee, not to unduly burden a patentee with additional expense." *Software Rights Archive, LLC v. Facebook, Inc.*, No. 5:12-cv-03790 RMW PSG, 2014 WL 116366, at *2 (N.D. Cal. Jan. 13, 2014). Thus, the "party seeking imposition of a patent prosecution bar must show that the information designated to trigger the bar . . . reasonably reflect[s] the risk presented by the disclosure of proprietary competitive information." *Deutsche Bank*, 605 F.3d at 1381. The "kind of information that will trigger the bar" is "relevant to the preparation and prosecution of patent applications before the PTO." *Id.* at 1381. Following this logic, courts have found technical information like source code, software documentation, and hardware schematics subject to prosecution bars. *See, e.g.*, *Everlight Elecs. Co. v. Nichia Corp.*, No. C 13-80251 WHA (misc), 2013 WL 6252530, at *7 (N.D. Cal. Dec. 3, 2013) (defining in protective order information subject to prosecution bar as including attorneys' eyes only trade secrets and source code). Other courts simply refer to "highly confidential" information. *See, e.g.*, *Amaranth, Inc. v. Pizza Hut, Inc.*, No. 3:11-cv-01810-JLS-NLS, 2012 WL 528248 at *6 (S.D. Cal. Feb. 17, 2012). This includes information about a party's accused products, *see, e.g.*, *John v. Lattice Semiconductor Corp.*, No. C 12-04384 PSG 2013 U.S. Dist. LEXIS 65121, at *8 (N.D. Cal. May 7, 2013) (declining to limit the prosecution bar to "new information" and withhold from the prosecution bar's protection "information related to the products accused in this case"); *Everlight Elecs. Co.*, 2013 WL 6252530, at *7 (including in the prosecution bar information about the accused products). However, the information must be truly confidential and not able to be ascertained through reverse engineering or other means. *See Clayton Corp. v. Momentive Performance Materials, Inc.*, No. 4:12CV1349 AGF, 2013 WL 2099437, at *3 (E.D. Mo. 2013) (declining to impose a prosecution bar where "the parties can easily 'reverse engineer' the accused products without specialized information"); *Davis v. AT&T Corp.*, No. 98-CV-089S(H), 1998 WL

United States District Court
Northern District of California

4

912012, at *2 (W.D.N.Y. Dec. 23, 1998) (applying prosecution bar where the information "cannot be ascertained through use of the products or 'reverse engineering'"); *see also KSEA*, 2014 WL 6629431, at *3 (granting prosecution bar in part because "information that will be revealed during the course of discovery in the form of software design documents and specifications remains confidential as it cannot be discovered in existing patents or through reverse engineering").

B.     Discussion

Stryker contends that the challenged portions of the 24 documents trigger the prosecution bar because they consist of highly confidential technical information about the design and operation of Stryker products that is not disclosed to the public and could not be learned by inspecting, reverse engineering, tearing down, or testing the products; that is directly related to the subject matter of this action and to patent applications that KSEA's counsel is currently prosecuting; and thus the disclosure of which could cause Stryker significant competitive harm. KSEA, for its part, argues that none of the information is subject to the prosecution bar because the information offers no competitive or patentable advantage, and it describes standard technology principles and/or can be determined from use, visual inspection, or reverse engineering. Due to the similar nature of much of the material, in their papers the parties refer to nine "sets" of documents. The Court will address each in turn.

1.     KSEA's General Challenges

Before delving into the content of each set of materials, KSEA argues generally that none of Stryker's designated information presents a risk of misuse by KSEA in patent prosecution. This assertion is, in effect, an argument for reconsideration of the Court's order adopting the prosecution bar in the first instance. KSEA's failure to move for reconsideration, let alone satisfy the stringent reconsideration standards, is reason alone to reject KSEA's arguments. In any event, each is also unpersuasive.

First, KSEA contends that there is no risk of it using the designated information to prosecute claims in an application related to the '310 patent, the '530 patent, the '657 patent, or the '420 patent because there are no applications pending and the deadline for filing them has passed. (Dkt. No. 172 at 10 (citing 37 C.F.R. § 1.53(d)(1)(iii)).) This argument ignores the

5

prosecution bar's plain language.  The prosecution bar prevents litigation counsel from participating in the prosecution of patent applications "relating to the subject matter of this action, including without limitation the patents asserted this action and any patent or application claiming priority to or otherwise related to the patents asserted in this action[.]"  (Dkt. No. 115 ¶ 8.)  Thus, to trigger the prosecution bar, counsel need only prosecute applications that relate to the same subject matter as the patents-in-suit.  *See, e.g.*, *Avago Techs., Inc. v. IPtronics Inc.*, No. 5:10-cv-02863-EJD, 2015 WL 3640626, at *4 (N.D. Cal. June 11, 2015) (in order imposing sanctions for violating a prosecution bar, noting that counsel had engaged in patent prosecutions that relate to the systems involved in the patents-in-suit and that "the prosecution bar is not narrowed to claimed structures alone").  KSEA does not dispute that Mr. Whitmyer is currently involved in prosecuting patent applications that relate to the subject matter of this action.  (Dkt. Nos. 165-46—165-43.)  Thus, Stryker has (again) established that a risk exists of Mr. Whitmyer, KSEA's lead trial counsel, engaging in the type of patent prosecution activity that the prosecution bar is designed to cover.

Second, KSEA argues that the Patent Act eliminates any risk that it will use the designated information to prosecute claims in new or pending applications relating to the '821 Patent because the information is several years old and publicly available, which makes it prior art that would prevent KSEA from obtaining a patent.  (Dkt. No. 172 at 10 (citations omitted).)  If a device is "known or used by others" in the United States before the date of invention or if it is "in public use" in the United States more than one year before the date of application, it qualifies as prior art that bars a patent.  *See* 35 U.S.C. § 102(a), (b).  From KSEA's perspective, the age of information is determinative.  Not so.  For one, material that is not embodied in any current, publicly available Stryker product but might be incorporated into future Stryker designs is not prior art.  KSEA argues that the mere possibility of future products does not warrant a prosecution bar.  But the case on which KSEA relies is not so broad.  In *Smartflash LLC v. Apple Inc.*, No. 6:13-cv-447, 2014 WL 10986995, at *1-2 (E.D. Tex. May 12, 2014), the court noted that "[t]he possibility of future product plans potentially being contained in the confidential information is not sufficient to impose a prosecution bar."  But the mere possibility in *Smartflash* was far more attenuated than

the risk that Stryker might include the information in a new product; unlike Stryker, which

competes directly with KSEA, the *Smartflash* party was a non-practicing entity that did not sell

any products.

As for information that *is* incorporated into publicly-available products, KSEA ignores that

relevant patent prosecution activities may include long-pending applications, that is, applications

filed before any potentially invalidating prior art.  Further, KSEA also ignores that another risk of

disclosure of the confidential information is that KSEA will use what it learns about Stryker's

products to avoid claiming any prior art in any patent applications.  Moreover, neither the statute

nor the authorities on which KSEA relies compel the conclusion that aspects of a publicly

available device that remain confidential are prior art to all unclaimed features.  KSEA cites

*Lockwood v. American Airlines, Inc.*, 107 F.3d 1565 (Fed. Cir. 1997), which involved technology

used for airline reservation systems, for such a proposition.  There, the Federal Circuit affirmed

the district court's conclusion that the asserted claims in the patent-in-suit would have been

obvious in light of a prior patent (the '631 patent) combined with the publicly available SABRE

system.  *Id.* at 1570, 1572.  The *Lockwood* court rejected the plaintiff's argument that because

certain "essential algorithms of the SABRE software were proprietary and confidential and . . .

those aspects of the system that were readily apparent to the public would not have been sufficient

to enable one skilled in the art to duplicate the system[,]" because those algorithms were not part

of the patented claims.  In other words, the court emphasized that the plaintiff could not overcome

the prior art conclusion "by evidence showing that other, *unclaimed* aspects of the SABRE system

were not publicly available."  *Id.* at 1570.  Here, in contrast, it is the claimed aspects of Stryker's

products that Stryker contends are embodied in the designated material and are not publicly

available despite public use of the products.

In a similar vein, KSEA asserts that a prosecution bar can never cover existing products.

Courts in this District have concluded otherwise.  *See, e.g.*, *John*, 2013 U.S. Dist. LEXIS 65121, at

*8; *Everlight Elecs.*, 2013 WL 6252530, at *7.  The Court agrees with these courts that such

protection is appropriate, so long as the information at issue in the existing, accused products is

not capable of being ascertained through use, visual inspection, reverse engineering, or tearing

United States District Court
Northern District of California

1  down or testing the product.  The cases that KSEA cites do not persuade the Court otherwise.

2  While the ITC noted in *In the Matter of Certain Elec. Devices with Image Processing Systems,*

3  *Components Thereof, and Associated Software*, Inv. No. 337-TA-724, USITC Order No. 12, 2010

4  WL 5474165 at * 5 (U.S. Int'l Trade Comm'n Dec. 3, 2010) ("*Apple ITC*") that "[t]echnical

5  information about products in public use does not raise the same risk of misuse in patent

6  prosecution as might be raised by technology that has not yet been sold or included in a patent

7  application," this distinction only holds true to the extent that the public can readily ascertain the

8  technical information from that public use.  The *Apple ITC* case noted that the products at issue

9  there—ubiquitous Apple products—were susceptible to reverse engineering.  On other occasions

10  the ITC has extended prosecution bar protection to a party's accused products.  *See, e.g.*, *In the*

11  *Matter of Certain Pers. Data & Mobile Commc'ns Devices & Related Software*, No. 337-TA-710,

12  2010 WL 4783415, at *2 (U.S. Int'l Trade Comm'n Sept. 1, 2010).

13          In short, KSEA's general challenges to the prosecution bar designations are an improper

14  motion for reconsideration and otherwise unpersuasive.  The Court will instead address whether

15  Stryker has proffered sufficient justification to designate each set of materials as subject to the

16  prosecution bar.

17                  2.       Justifications for Each Set of Materials

18                          a.       *Set One*

19          The designated portions of the Set One materials[3] are charts that describe the structure and

20  function of systems, subsystems, and components within Stryker's 1488 Camera System.  (*See*

21  Dkt. Nos. 164-9 at 7, 164-10 at 7, 164-11 at 2.)  In support of their motion, Stryker submitted the

22  declaration of Staff Engineer Rohit Subramanian, who was involved in the research, design, and

23  development of the 1488 Camera System.  (Dkt. No. 165-2 ¶ 5.)  According to Mr. Subramanian,

24  the charts show in a graphical form the mapping of functions to structure within the 1488 Camera

25

26  _____

27  [3] The Set One documents include portions of Exhibits 1, 2, and 3 to the Declaration of Michael J.
    Carrozza filed in support of Stryker's motion, including the pages Bates-stamped
    STRKS00000289, STRKS00000295, and STRKS00019356, respectively.  References throughout

28  this Order to numbered exhibits likewise refer to the exhibits attached to the Carrozza Declaration,
    unless otherwise noted.

System and specifically identify how the two work together, that most of the information would be impossible to figure out without the aid of Stryker's design history file, and that without the information in the chart a person would not be able to identify how the system works.  (*Id.* ¶ 15.)  He contends that the information is valuable because it succinctly describes how the 1488 Camera System works, and that counsel learning this information could use it to draft, amend, or alter the scope of patent claims relating to video camera technology, image processing, or device control or to steer a client's development efforts for new products that would compete with Stryker's.  (*Id.* ¶¶ 15-16.)

In making these statements, Mr. Subramanian refers generally to the information in the chart.  (*See id.* ¶ 13 ("*Most* of the information would be impossible for a person to figure out without the aid of Stryker's design history file.") (emphasis added).)  However, he also provides some specific examples, averring that without the information in the charts "a person would not be able to identify ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"  (*Id.* ¶ 14.)

KSEA urges that the prosecution bar designation for the Set One materials is inappropriate for several reasons.  KSEA's expert, Albert Juergens, avers that the relationships between the structures and their functions are (1) known to or commonly encountered by persons skilled in the art, (2) easily observable by visual inspection, (3) discernable using public information plus visual inspection; and (4) disclosed elsewhere in Stryker's document production as not subject to the prosecution bar.  (Dkt. No. 172-13 ¶¶ 10-38.)  In his declaration Mr. Juergens addresses all 27 functions listed in the chart and explains why the relationship with the associated structures is ascertainable.  (*See id.*)

On the one hand, Mr. Juergens does not aver that he ever attempted to reverse engineer the products himself, or test or tear down the products.  He declares that some of the structure-function relationships in the charts are ascertainable through visual inspection (*Id.* ¶¶ 11, 13- 26, 28, 29), and at oral argument KSEA emphasized that certain features are obvious by looking at the product—for example, that ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████ But Mr. Juergens never states that he actually inspected the

1488 Camera System; instead, his statements about visual inspection are based on his viewing the

product's confidential schematics.  At oral argument, KSEA maintained that the information need

only be ascertainable by visual inspection to avoid prosecution bar designation, but the declarant

himself need not have actually ascertained the information in that manner.  KSEA likened Mr.

Juergens's declaration to an architect describing the features of a building based on the blueprint

alone.  That is, while the architect might not have visited a house to see that the front door leads

into an entryway that has two windows and a staircase, the architect could easily describe these

details by looking at the blueprint alone.  So it is with Mr. Juergens viewing the schematics-charts

of the 1488 Camera System, they urge.  Notably, Mr. Juergens does not address this point,

nowhere averring that his examination of schematics is akin to visual inspection.  And in any

event, this argument is troubling because the "blueprint" here is not a publicly available document,

but rather comes from confidential schematics that Mr. Juergens would not have access to but for

this litigation.  When pressed at oral argument, KSEA conceded that it could not cite any authority

that permits it to use other confidentially-designated information to defeat prosecution bar

designation.  Thus, Mr. Juergens's statements that certain aspects are capable of being ascertained

through visual inspection, based only on his review of confidential schematics of the product and

not on actual visual inspection, hold little weight.

In any event, Mr. Juergens only avers that some structure-function relationships that the

Set One materials reveal are capable of being ascertained through visual inspection.  (*See* Dkt. No.

172-3 ¶¶ 11, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 30 (averring that the structures

are easily identifiable through visual inspection); *id.* ¶¶ 28-29 (contending that some elements are

identifiable through visual inspection, but not ███████████████████████).)  He does not aver

that the structures associated with ████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████—*i.e.*, the particular structure-function relationships that Mr.

Subramanian gave as examples in his declaration of information that a person could not obtain

10

without reviewing Stryker's design files.  With respect to these aspects of the 1488 Camera System, Mr. Juergens states that certain information is common, logical, or customary in the field. (*See, e.g.*, *id.* ¶ 12, 15, 16, 17, 18, 26, 31-36.)  This type of hindsight reasoning—that is, concluding that the confidential information confirms what is often the case—is not the same as establishing that the information is generally available to the public through visual inspection or reverse engineering of the 1488 Camera System.

Elsewhere, Mr. Juergens avers that this information is already disclosed in non-prosecution bar documents.  (*See, e.g.*, *id.* ¶¶ 31-36.)  But the page that Mr. Juergens repeatedly identifies (STRKS000024926) is still designated Highly Confidential – Attorneys' Eyes Only.  To hold that a party cannot claim prosecution bar protection over information that can be inferred by relying in part on attorneys' eyes only information would merely incentivize document-producing parties to claim prosecution bar protection for more documents.  Whether the prosecution bar should apply to particular information does not turn on whether certain other information is revealed in highly protected, confidential exchanges during the course of litigation, but whether the prosecution bar information is capable of being ascertained based on publicly available information.  Moreover, it appears that the non-prosecution bar documents that Mr. Juergens identifies do not actually indicate which specific parts are responsible for the ███████████████████████—the information at the heart of the Set One designations—nor does it divulge the particular functions of ██████████████ which by Mr. Juergens's own admission are not capable of being ascertained by visual inspection even with the benefit of the confidential schematics.

At oral argument, KSEA insisted that the information in this set—and the next five—are so high level that the information cannot trigger a prosecution bar.  And while, to a certain extent, that may be true, Mr. Juergens does not aver as much with respect to the Set One documents. While the Court is persuaded that some of the structure-function relationships in the chart are so high level that they are not such stuff as prosecution bar material is made of—for example, that ███ ███████████████████████████████████—at bottom KSEA has not offered an explanation for why *all* of the information in the charts falls into that category, in particular the specific examples to which Mr. Subramanian referred.

In their reply and at oral argument, Stryker argues that to the extent that some of the information in the chart is subject to the prosecution bar and others are not, the nature of the chart—that is, its overlapping lines connecting structure to function—could not be further redacted to meaningfully disclose only certain information.  Put another way, the prosecution bar material is inextricably intertwined with the other non-prosecution bar information.[4]  The Court agrees: there is no way to remove the lines connecting the prosecution-bar structures and functions from those capable of being ascertained through visible inspection.  KSEA offered no solution to this problem, instead insisting instead that none of the information should be subject to the bar.[5]  Not so, for the reasons described above.  Further, Mr. Juergens never meaningfully rebuts Mr. Subramanian's explanation of how a competitor could use the designated information in these materials for a competitive advantage.

Thus, Stryker has established that the highlighted information in the Set One materials appropriately triggers the prosecution bar, and the Court is not persuaded by KSEA's arguments to the contrary.

3.    *Set Two*

The Set Two materials[6] are from the 1488 Camera System design files and are charts that provide information about how █████████████████████████████████████████████ ██████████████████████████████████████ (Dkt. No. 165-2 ¶¶ 17, 24.)  According to Mr.

---

[4] Stryker first argued that prosecution bar material was inextricably intertwined with other highly confidential material in its reply.  The Court ordinarily does not consider arguments that are raised for the first time in reply.  But here, the argument was a direct response to KSEA's opposition, more specifically to KSEA's argument that certain information that Mr. Subramanian's declaration did *not* address—*i.e.*, █████████████████████████████ ████████████████—were not prosecution bar material. KSEA had the opportunity to address this point at oral argument in detail.  Thus, under the circumstances present here the Court considers the argument.

[5] At oral argument, KSEA insisted that the information that the overlapping lines discloses is "so blatantly obvious" about what functions do what role, but declined the Court's invitation to have Stryker produce the document with the structure-to-function lines completely redacted.

[6] The Set Two documents include portions of Exhibits 4 through 9 to Stryker's motion, including the pages Bates-stamped STRKS00000385, STRKS00024922-24966, STRKS00024967-25011, STRKS00025024, STRKS00028905-28922, and STRKS00028923-28940, respectively.

United States District Court
Northern District of California

1    Subramanian, the designated information is ████████████████

2    ███████████████████████████████████████████████

3    ███████████████████████████████████████████  most

4    of which would be impossible for a person to figure out without the aid of Stryker's confidential

5    design file.  (*Id.* ¶ 24.)  Mr. Subramanian does not address ████████████████

6    ████████████  included in the Set Two charts, but he does give several specific examples of

7    information that a person would not be able to identify without the design file—namely, a person

8    would not be able to identify ████████████████████████████████

9    ███████████████████████████████████████████████████

10   ████████████████████████  (*Id.* ¶ 26.)

11       Mr. Subramanian further avers that the diagrams are analogous to source code because a

12   person reviewing the information can gain an understanding of how the software operates ████████

13   ████████████████████  (*Id.* ¶ 27.)  Moreover, the diagrams all differ slightly due to

14   changes made to the designs during the research and development process, so some of the

15   information in the Set Two materials is not embodied in Stryker's accused products.[7]  (*Id.* ¶ 25.)

16   As with the Set One materials, Stryker argues that while some of the information might not be

17   subject to the prosecution bar, the overlapping lines in the charts in this materials means that the

18   prosecution bar material is inextricably intertwined with the other highly confidential information

19   such that redactions would be impossible.

20       KSEA, for its part, urges that the Set Two materials describe standard designs and

21   mechanisms for debugging and testing software to meet industry standards and information that

22   can easily be determined through visual inspection of the physical boards.  (Dkt. No. 172-13

23   ¶¶ 39-42.)  But again, Mr. Juergens bases his conclusions, in part, on the information that is

24   subject to the bar itself or otherwise designated highly confidential, and merely concludes that the

25   information therein logically follows.  (*See, e.g.*, *id.* ¶ 39 (identifying the ████████████

26

27   ─────────────────────

28   [7] Mr. Subramanian does not explain which versions of the Set Two materials were actually
     incorporated into the final 1488 Camera System and which versions were left on the design room
     floor.  (*See* Dkt. No. 165-2 ¶ 25.)

United States District Court
Northern District of California

1  ████████ in the chart and noting that it is "standard" to use them for that purpose); *id.* ¶ 40

2  (identifying ██████████████████████ based on the chart, then concluding that "it is logical" that

3  the product would use them).)  None of these representations establish that the information is

4  ascertainable to the public through visual inspection or reverse engineering or otherwise.

5         The Juergens Declaration does include information responsive to the specific examples

6  that Mr. Subramanian gave.  He avers that ████████████████████████████████████████

7  ███████████████████████████████████████████████████████████████

8  ████████████████████████████████████████ (*Id.* ¶ 40.)  Once again, as with the Set

9  One materials, Mr. Juergens never represents that he actually engaged in a visual inspection of the

10 boards and reached the same conclusions that the designated information reveals, which leaves the

11 Court skeptical as to the credibility of his statements.  But even accepting it as true, Mr. Juergens

12 does not make any representations about how one could ascertain through visual inspection that

13 ████████████████████████████████████████████████████████████████

14 ████████████████████████████████████████—the specific information

15 that Mr. Subramanian's declaration addressed.  Thus, even if ████████████████████ is

16 ascertainable, KSEA has not demonstrated that all of the information in the Set Two materials is.

17        In a similar vein, Mr. Juergens concludes that "the majority of the information" in the chart

18 is easily determinable.  Even if he had established that, he concedes that *some* of the information

19 in the chart is not.  And the nature of the chart—in particular, that it largely consists of

20 overlapping lines connecting various components—prevents narrow redactions from being

21 possible.  Put simply, as Stryker contends, the prosecution-bar information is inextricably

22 intertwined with the rest of the information in the chart, just like the Set One materials.

23        At the same time, Mr. Juergens contends that the charts in the Set Two materials actually

24 contain "very little information" and not enough on their own to provide any competitive

25 advantage.  (*Id.* ¶ 41.)  His focus on the chart alone is of little import.  So too with his statement

26 that a person skilled in camera hardware or software design could come up with the chart using

27 detailed design documents (*id.*); these documents are also highly confidential, and thus not the

28 type of materials available to the public.  Moreover, Mr. Juergens again fails to address Stryker's

United States District Court
Northern District of California

14

1   contentions that the unused designs contained in the design files also have value that a competitor

2   could use to Stryker's disadvantage.

3          For each of these reasons, the Court concludes that Stryker has met its burden of

4   establishing that the designated information is subject to the prosecution bar.

5                    4.    *Set Three*

6          The Set Three materials[8] include two types of information.  First, it contains the same or

7   similar charts analyzed in the Set Two materials (*see, e.g.*, STRKS00000838, STRKS00000846),

8   and the same reasoning applies to them.  Thus, those pages have been properly designated subject

9   to the prosecution bar.

10          The new information in the Set Three materials are charts that show the software

11   architectural design for all individual software ▮▮▮▮▮ within the 1488 Camera System.  (Dkt.

12   No. 165-2 ¶ 29; *see* STRKS00000837, STRKS00000845.)  The designated diagrams show how

13   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14   ▮▮▮▮▮▮▮▮▮▮▮ (*Id.* ¶ 34.)  Specifically, Mr. Subramanian avers that a person

15   without these charts and the rest of the confidential (but not prosecution bar) design files, would

16   not be able to identify ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18   ▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*)  According to Mr. Subramanian, a person

19   reviewing this information could learn how the 1488 Camera System software operates just as

20   they could from reviewing source code, which presents a competitive risk that opposing counsel

21   could use this information to develop and patent products that could interoperate with Stryker's

22   other video camera technology, image processing, or device control products.  (*Id.* ¶¶ 35-36.)

23          KSEA, for its part, contends that the software architectural charts are not useful because

24   they do not disclose enough information to actually convey ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25   ▮▮▮▮▮▮▮▮▮▮ and therefore pose no competitive risk because they do not permit a

26

27   ───────────────
     [8] The Set Three materials include portions of Exhibits 10 and 11, including the pages Bates-
28   stamped STRKS00000837-838 and STRKS00000845-846, respectively.

15

United States District Court
Northern District of California

person to develop a product that interoperates with the 1488 Camera System.  (Dkt. No. 172-13 ¶ 45.)  Mr. Juergens views the chart in isolation, and thus does not address Mr. Subramanian's point that this chart in conjunction with other information in the system's design files permit a person to draw conclusions about how the system functions.  As with the materials in Sets One and Two, in their reply and at oral argument Stryker contended that the structural aspects of the charts in these exhibits means that prosecution bar material is inextricably intertwined with other highly confidential information.  KSEA did not directly respond to this argument, but insists that none of the information in the chart is subject to the bar, so the inextricably intertwined argument is beside the point.

The gravamen of KSEA's argument about the Set Three materials is that they are so generic and high-level that they have limited technical use, even to a person familiar with camera hardware or software design.  (*See* Dkt. No. 172 at 13; *see also* Dkt. No. 172-13 ¶¶ 43-46.)  What Mr. Juergens actually avers is not that the bulk of the information in the Set Three materials is capable of being ascertained through visual inspection, reverse engineering, tearing down the system, or testing, but rather that "[a]nyone with significant software design experience would *surmise*" that the 1488 Camera System functions in the manner the Set Three materials disclose.  (Dkt. No. 172-13 ¶ 44 (emphasis added).)  While someone might be able to guess, that is not the same as being able to confirm as much (through reverse engineering or visual inspection or otherwise) or being handed information from the source that confirms such a hunch.

Mr. Juergens also contends that a skilled programmer could write source code to achieve the same functional response that the Set Three materials disclose.  But whether a skilled programmer could use prosecution-bar materials—or even other confidential documents disclosed in this litigation—to write source code to mimic the 1488 Camera System's software is irrelevant. The question is whether a skilled programmer could write that source code based solely on the publicly available product.  On this point, Mr. Juergens's declaration is silent.

Mr. Juergens further avers that the Set Three materials have no competitive value. Viewing the chart in isolation, he states that a person could not develop an interoperable product with that information alone.  (*Id.* ¶ 45.)  But again, this statement ignores Mr. Subramanian's point

United States District Court
Northern District of California

that the information in the chart along with the entire confidential design file could forge a path to an interoperable product.  Trying a different tack, Mr. Juergens avers that assuming there is some interoperable device already on the market, ████████████████████ disclosed in the Set Three materials "could be reverse engineered by capturing the interface communication between the camera and the interoperable device[.]" (*Id.*)  But he does not attest that he or anyone else could reverse engineer the 1488 Camera System to determine ██████████████

██████████████████████████████████

████████████████████████████—the

information that Mr. Subramanian averred was impossible to ascertain without access to the design files.  Nor has Mr. Juergens rebutted Mr. Subramanian's representations about how an attorney could use the information to shape patent prosecution for an interoperable product—in other words, that the information holds competitive value.

       For each of these reasons, Stryker has met its burden of establishing that the designated information in the Set Three materials triggers the prosecution bar.

              5.    *Set Four*

       The Set Four materials[9] are schematics for ████████████████████████ of the 1488 Camera System.  (Dkt. No. 165-2 ¶ 37.)  The designated information in these documents shows how ████████████████████████████

██████████████████████████████████

████████████████ (*Id.* ¶¶ 42-47.)  The Subramanian Declaration explains how a person would not be able to identify particular features of the 1488 Camera System without all of the designated information.  (*Id.*)  At bottom, the information shows how the system works ████████ ████ which Mr. Subramanian represents is akin to learning how a system works by examining its source code.  (*Id.* ¶ 50.)  According to Mr. Subramanian, the information cannot be discovered

United States District Court
Northern District of California

_____

[9] The Set Four materials include portions of Exhibits 12 and 13.  From Exhibit 12, the designated portions include the pages Bates-stamped STRKS00000532-533, STRKS00000535-539, STRKS00000552, and STRKS00000562-567.  In Exhibit 13, the designated portions include the pages Bates-stamped STRKS00001309-1310, 1312-1316, STRKS00001329, and STRKS00001344.

through inspection, reverse engineering, or tearing down or testing the system, and a competitor

could use the information, especially the designs not actually incorporated into the 1488 Camera

System, to design future products, to modify existing products, or to develop products that could

be used with the system instead of Stryker's own interoperable products.

As a threshold matter, KSEA makes no argument that any of the pages that disclose

schematics that were not actually included and embodied in the 1488 Camera System are capable

of reverse engineering or discovery through visual inspection, so the Court construes this as a

concession that at least this subset of the Set Four materials is properly subject to the prosecution

bar.  KSEA instead argues generally that the information in Set Four that is embodied in the

current 1488 Camera System can be determined through visual inspection, printed circuit board

traces of the ███████████████████████████, and reference to public data sheets for the

chips on those boards.  (Dkt. No. 172 at 13.)  Though KSEA devotes only two sentences in its

opposition to the Set Four materials, Mr. Juergens actually discusses the designated information in

much greater detail worthy of discussion here.  The Court will address each declarant's competing

representations about specific groups of materials.

**STRKS00000532 and STRKS000001309.**  Mr. Subramanian avers that without the

designated material on these pages a person would not be able to identify how ███████████

███████████████████████████████████████████████████████████████████████

███████████████████ (Dkt. No. 165-2 ¶ 41.)  Mr. Juergens, for his

part, never represents that he ascertained this information through actual visual inspection, use of

the product, reverse engineering, or any other method, or that the public could do so as well.

Instead, he avers that looking at non-prosecution bar, highly confidential documents combined

with visual inspection of the ███████████ "it would be fairly straight forward to determine" that

the 1488 Camera System ███████████████████████████████████████████████

███████████████████ (Dkt. No. 172-13 ¶ 47.)  As discussed above, the

test is not whether a person could determine the designated information by using other

confidential information that would not have been disclosed but for this litigation.  Mr. Juergens's

declaration therefore does nothing to counter Mr. Subramanian's statements that the designated

18

information on these pages cannot be ascertained through publicly available information or the product itself, and that the information is competitively valuable.  This designated information is therefore properly subject to the bar.

STRKS00000533 and STRKS00001310.  Mr. Subramanian avers that without the designated material on these pages a person would not be able to identify █████████

████████████████████████████████████████████████████████████████████

█████████ (Dkt. No. 165-2 ¶ 42.)  Again, here, Mr. Juergens does not state that he or a member of the public could ascertain the designated information on these pages from inspection of publicly available information or the product itself.  Instead, he again states that "it is possible to largely back into" the information using non-prosecution bar, highly confidential materials "along with a physical copy of the board[.]"  (Dkt. No. 172-13 ¶ 48.)  For the reasons described above, this argument fails.  And even if it did not, Mr. Juergens concedes that some of the information on these pages is not available in the non-prosecution bar materials, such as ████████████

████████████ (*see id.*)—information that Mr. Subramanian avers would be helpful in designing products that interoperate with the 1488 Camera System.  Nor does Mr. Juergens meaningfully rebut Mr. Subramanian's explanation of how an attorney engaging in patent prosecution could use this information to a competitive advantage by designing competing or interoperable products.  The information is properly designated as subject to the prosecution bar.

STRKS00000535 and STRKS00001312.  Mr. Subramanian avers that without the designated material on these pages a person would not be able to identify how the 1488 Camera System ████████████████████████████████████

████████████████████ (Dkt. No. 165-2 ¶ 43.)  Mr. Juergens avers that the information on these pages does not disclose enough to reveal any competitive information about how ██████

████████████ (Dkt. No. 172-13 ¶ 49.)  For example, he avers that the document ██████████

████████████████████████████████████████████████████

██████████████████████████████████ (*Id.* (emphasis added).)  He also states that the documents do not provide details about whether █████████████████████

████████████████████ and this information is important to determining how ██████████

1            ███████████ (*Id.*) Based on these representations, he contends that the material in these pages

2 has little technical value. Mr. Juergens has established that had the designated materials provided

3 even more details about ████████████████ they would certainly pose a risk of

4 competitive harm and properly trigger the bar. But he has not rebutted Mr. Subramanian's

5 representation that the designated information should, as well. He has not countered Mr.

6 Subramanian's statement that the materials disclose some information about ███████████

7 ██████████; he has merely stated that the document does not disclose *exactly* how it

8 works. He has not stated that the information this document does disclose is capable of being

9 ascertained through publicly available information. He has not countered Mr. Subramanian's

10 explanation of how the information could be used to cause competitive harm to Stryker. He thus

11 fails to show that the information should not trigger the bar.

12            **STRKS00000536-539 and STRKS00001313-1316.** Mr. Subramanian avers that without

13 the designated material on these pages a person would not be able to identify █████████

14 ██████████████████████████████████████████████████████ (Dkt.

15 No. 165-2 ¶ 44.) For example, they reveal ██████████████████████████

16 █████████████████ (Dkt. No. 172-13 ¶ 50.) Mr. Subramanian avers that

17 without the designated material on these pages a person would not be able to identify █████████

18 ████████████████████████████████████████

19 ███████████████████ (Dkt. No. 165-2 ¶ 45.) Mr. Subramanian avers that without

20 the designated material on these pages a person would not be able to identify ████████

21 █████████████████████████████████████████████████

22 █████████████████ (Dkt. No. 165-2 ¶ 46.)

23            Mr. Juergens counters that these materials are less helpful than they could be—that is, they

24 would be more helpful if they revealed █████████████████ (*Id.*) But it does not follow

25 from this statement that █████████████ information that is actually disclosed does not reveal

26 any confidential, competitively sensitive information about how the 1488 Camera System works.

27 Nor does he affirmatively state as much. He states that some of the information—namely, ██████

28 █████████████████████████████—can be determined by visual inspection (again,

United States District Court
Northern District of California

1   based on viewing confidential schematics of the product, not actual visual inspection of the

2   product itself).  (*Id.*)  For the reasons described above, this argument is unpersuasive.  What is

3   more, even accepting Mr. Juergens's visual-inspection representation as credible in light of

4   KSEA's blueprint argument, it does not demonstrate that all of the information in the document is

5   publicly available.  Instead, Mr. Juergens's declaration compels the opposite conclusion: for

6   example, he states that the information about ███████████████████████ "is available

7   through a combination of other non-prosecution bar designated pages in the schematic, studying

8   the physical board, and/or the data sheets for the attached chips[.]"  (*Id.*)  For the reasons already

9   discussed, KSEA cannot defeat the prosecution bar designation by contending that the information

10  is ascertainable by viewing other highly confidential material disclosed during this litigation.  The

11  information is therefore properly subject to the bar.

12          **STRKS00000552 and STRKS00001329.**  Mr. Subramanian avers that without the

13  designated material on these pages a person would not be able to identify how ███████████

14  ███████████ because a third party, ███████████████████ designed it specifically for Stryker

15  on a confidential basis.  (Dkt. No. 165-2 ¶ 48.)  Mr. Juergens responds that ███████████████

16  ██████████████████████████████████████ are both identifiable through visual

17  inspection of the 1488 Camera System's board, and that ███████████████████████████

18  ██████████████████ (Dkt. No. 172-13 ¶ 51.)  According to Mr. Juergens, the

19  aspects of ███████████ that are ascertainable through visual inspection "mirrors . . . almost

20  exactly" ███████████████████████████████

21  ██████████████████████████████████ (*Id.*)  Of course, the same

22  problems with Mr. Juergens's visual inspection comments plague his representation about ███

23  ███████████ it is based not on visual inspection but on information gleaned from confidential

24  documents.  Moreover, there is some question about whether Mr. Juergens would have known to

25  compare ████████████████████████████████████████ in the 1488

26  Camera System absent Mr. Subramanian's confidential declaration revealing as much.  But

27  Stryker does not make this argument, and has not rebutted that ███████████████████

28  ███████████e is publicly available.

1    Instead, Stryker attempts to rebut Mr. Juergens's ▮▮▮▮▮▮ representations solely by

2    arguing that side by side comparison of the designated information and ▮▮▮▮▮▮▮▮▮▮

3    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ reveals that the two are not actually alike: ▮▮▮▮▮▮▮

4    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5    ▮▮▮▮▮▮▮ (Dkt. No. 178 at 14.)  But neither Mr. Subramanian nor anyone else at Stryker

6    avers as much in a declaration.  Mere attorney argument is not sufficient to rebut Mr. Juergens's

7    representations that the two are the same.

8    Despite Mr. Subramanian's representation that ▮▮▮▮▮▮▮▮▮▮▮▮▮ is

9    confidential and could not be identified, based on Mr. Juergens's unrebutted representations that

10   features of ▮▮▮▮▮▮▮ are capable of being ascertained by visual inspection, but

11   more importantly, given the publicly available ▮▮▮▮▮▮▮▮▮▮▮▮, the

12   information in these documents is not covered by the prosecution bar.

13   **STRKS00000562-567 and STRKS00001339-1344.**  The designated information on these

14   pages is labeled ▮▮▮▮▮▮▮▮▮▮▮ and thus represents information that the

15   design team chose not to include in the 1488 Camera System components.  (Dkt. No. 165-2 ¶ 49.)

16   Specifically, the components disclose how ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*)

17   Because this information is not embodied in the final product, it would be impossible to learn from

18   visual inspection or reverse engineering.  (*Id.*)  Mr. Juergens response is that these ▮▮▮▮

19   ▮▮▮▮▮ are not needed to understand the 1488 Camera System, since they were not

20   incorporated into it.  (Dkt. No. 172-13 ¶ 52.)  That makes sense.  But he has not directly rebutted

21   Mr. Subramanian's contentions that the information discloses how ▮▮▮▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮ that it is not publicly available or capable of being ascertained through visual

23   inspection or reverse engineering, and that it could be used to design future products.  The

24   prosecution bar designation is appropriate for this material.

25                                       *   *   *

26   Stryker is therefore entitled to retain its prosecution bar designation over all of the Set Four

27   materials except for ▮▮▮▮▮▮▮▮ information set forth in STRKS00000552 and

28   STRKS00001329.

United States District Court
Northern District of California

1    6.    *Set Five*

2    The Set Five materials[10] are also from the design history file for the 1488 Camera System.

3    (Dkt. No. 165-2 ¶ 52.)  The information provides software requirement specifications, including

4    ████████████████████████████████████████████████████████████████████████████████

5    ██████████████████████████████████████████████████████████   (*Id.*)  Mr.

6    Subramanian avers that "[m]ost of this information would be impossible to figure out without the

7    aid of Stryker's design history file" and the information is kept confidential and could not be

8    obtained through reverse engineering, tear down, or testing.  (*Id.* ¶¶ 55-56.)  For example, the

9    designated material in Set Five reveals how ████████████████████████████████████

10   ███████████████████████████████████   (*Id.* ¶ 56.)  Other designated material

11   provides information about ██████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████████████

13   ████████████████████████████████████   (*Id.*)  Mr. Subramanian avers that the

14   highlighted information in Set Five is akin to source code because it sets forth how the system

15   operates, and that competitors could use the information to design or modify products that replace

16   Stryker's products.  (*Id.* ¶¶ 57-58.)

17   KSEA offers two arguments why the Set Five materials should not trigger the prosecution

18   bar.  First, Mr. Juergens avers that the designated information that discloses information about ███

19   ████████████████████████████████████████████████████████████████████   can be

20   determined by using a "sniffer" device on all ports and connections used for communications,

21   which can be identified through visual inspection after referencing pages marked "HIGHLY

22   CONFIDENTIAL—ATTORNEYS' EYES ONLY."  (Dkt. No. 172-13 ¶¶ 54-58.)  Even accepting

23   Mr. Juergens's representations as true, as discussed above, piecing together the designated

24   information with the help of attorneys-eyes-only materials is not the same as establishing that the

25   public could obtain the information through Stryker's publicly available product alone.

26   KSEA further argues that ██████████████████████   are common in the industry and

27

28   ――――――――――――――――――
     [10] The Set Five materials include portions of Exhibits 14 and 15, including the pages Bates-
     stamped STRKS00000660-746.

23

therefore should not be subject to the prosecution bar. (Dkt. No. 172 at 13.) Specifically, Mr.

Juergens avers that the materials disclose that ███████████████████ and contends

that "it would be surprising" if the 1488 Camera System did not use some sort of ██████

due to international standards for medical devices. (Dkt. No. 172-13 ¶ 59.) But concluding that a

certain element "would not be surprising" is not the same as demonstrating that the element is

capable of being ascertained through use, visual inspection, reverse engineering, testing, or tear-

down. Nor has Mr. Juergens meaningfully countered Mr. Subramanian's explanation of how the

information could be used for a competitive advantage.

The designated information in the Set Five materials triggers the prosecution bar.

### 7.  *Sets Six through Nine*

Sets Six through Nine all designate information that Stryker alleges is akin to source code.

The Court will describe each set and Stryker's rationale for so designating the material separately,

but will address KSEA's response in one fell swoop, as KSEA presented it.

### a.  Set Six

The Set Six materials[11] are also from the design history file for the 1488 Camera System

and describe ██████████████████████████████ (*Id.* ¶¶ 59-60.) Mr. Subramanian

avers that "[m]ost of this information would be impossible for a person to figure out without the

aid of Stryker's design history file" and that the information is confidential and could not be

obtained through reverse engineering, tear downs, or testing. (*Id.* ¶ 62.) A competitor could use

this information to develop and patent a product or system that interoperates with the 1488

Camera System. (*Id.* ¶ 63.) In addition, ████████████████████████████

████████████████████████████████████████████ (*id.*),

which counsel viewing such information could use in drafting, amending, or otherwise affecting

the scope of patent claims relating to camera technology, image processing, or device control.

---

[11] The Set Six materials include highlighted portions of Exhibits 16 and 17. The designated information in Exhibit 16 is on pages Bates-stamped STRKS00000450-457, and STRKS00000459-481. The designated information in Exhibit 17 is on pages Bates-stamped STRKS00000487-494 and STRKS00000496-518.

United States District Court
Northern District of California

Mr. Juergens declares only that the information these materials disclose is ▮▮▮▮▮▮▮ ▮▮▮▮▮▮ that is common in the industry.  (Dkt. No. 172-13 ¶ 60.)

    b. Set Seven

Set Seven consists of a single exhibit that is the upgrade software manual for the 1488 Camera System.[12]  The designated information describes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Dkt. No. 165-2 ¶ 66.)  It includes ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See, e.g.*, STRKS00026052.) Mr. Subramanian avers that "[m]ost of this information would be impossible for a person to figure out without the aid of Stryker's design history file" and that the information is confidential and could not be obtained through reverse engineering, tear downs, or testing.  (Dkt. No. 165-2 ¶ 67.) For example, the Subramanian Declaration explains that without this information, a person would not be able to identify how the 1488 Camera System's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ (*Id.* ¶ 68.)  Likewise, because it reveals ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ the designated Set Seven information would permit a competitor to control the 1488 Camera System remotely or extend it.  (*Id.*)  Mr. Subramanian avers that the Set Seven information is akin to source code because it would permit a person reviewing it to understand how the 1488 Camera System software operates.  (*Id.* ¶ 69.)  He further states that a competitor could use the information to develop products that interoperate with or even replace Stryker's products.  (*Id.* ¶ 70.)

Mr. Juergens's declaration states only that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ these materials disclose are common for medical device software.  (Dkt. No. 172-13 ¶ 61.)

    c. Set Eight

The Set Eight materials[13] are also from the design history file for the 1488 Camera System.

---

[12] Specifically, Set Seven includes highlighted portions of Exhibit 18, including the pages Bates-stamped STRKS00026045-26053, STRSKS00026055, STRKS00026057-26060.

[13] The Set Eight materials include highlighted portions of Exhibits 19, 20, and 21.  The designated information in Exhibit 19 is on pages Bates-stamped STRKS00000641-646.  The designated information in Exhibit 20 is on pages Bates-stamped STRKS00000648-653.  The designated information in Exhibit 21 is on pages Bates-stamped STRKS00018407-18413.

United States District Court
Northern District of California

Exhibits 19 and 20 describe ████████████████████████████████████ (Dkt.
No. 165-2 ¶¶ 71-72.)  Exhibit 21 relates to the 1088 Camera System, but contains the same or
substantially similar information and uses ████████████████ (*Id.* ¶¶ 74.)  In some
portions of the documents, ████████████████████████ is labeled
"HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY"; only ████████████████
██████ have been designated as subject to the prosecution bar.  (*See id.*)  Elsewhere, the specific
data for ██████████████ is likewise designated as subject to the bar.  (*See, e.g.,*
STRKS00000643.)  Mr. Subramanian avers that "[m]ost of this information would be impossible
for a person to figure out without the aid of Stryker's design history file" and that the information
is confidential and could not be obtained through reverse engineering, tear downs, or testing.
(Dkt. No. 165-2 ¶ 75.)  For example, he states that without the designated information, a person
would not be able to identify ████████████ and thus would not be able to ████████
████████████████ *Id.* ¶ 76.)  Similarly, a person would not able to determine ████
████████████████████████████████████████████████████
████████████████████ (*Id.*)  According to Mr. Subramanian, this
information is crucial to understanding how various Stryker components work together and thus
akin to source code, and viewing it could allow a competitor to develop a camera that could
communicate with Stryker's SDC product.  (*Id.* ¶¶ 76-77.)

     Mr. Juergens avers that these documents do not reveal ████████████████, but
he makes guesses about what it is and, assuming that is correct, contends that it "should be
possible to back into" ██████████ that the documents reveal.  (Dkt. No. 172-13 ¶¶ 63-64.)

           d.     Set Nine

     The designated portions of the Set Nine materials[14] are all related to Stryker's SwitchPoint
product line.  (*See* Dkt. No. 165-3 ¶¶ 8, 13, 18.)  In support of their motion, Stryker submitted the
declaration of Principal Engineer Alan Richard Potts II, who was involved in the research, design,

---

[14] The Set Nine materials are highlighted portions of Exhibits 22, 23 and 24.  The designated
portion of Exhibit 22 includes the pages Bates-stamped STRKS00018376-18378.  The designated
information of Exhibit 23 is on pages Bates-stamped STRKS00018384-18401.  The designated
information of Exhibit 24 is on pages Bates-stamped STRKS00018379-18383.

United States District Court
Northern District of California

and development of the SwitchPoint Infinity software and related products. (Dkt. No. 165-3 ¶ 3.) According to Mr. Potts, "[m]ost of the designated information in the Set Nine materials would be impossible for a person to figure out without the aid of Stryker's design files, as the information is confidential and not subject to determination through reverse engineering, tear-downs, or testing. (*Id.* ¶¶ 9, 14, 19.)

Specifically, without the designated information in Exhibit 22, a person would not be able to identify the "architecture and boundaries of the SwitchPoint Control System[,]" and specifically, would not understand how ███████████████████████████████████ ████████████████████████████ (*Id.* ¶ 10.) Similarly, only the designated information in Exhibit 23, which is a design file that provides a user guide for ██████████ ████████████████████ and contains ██████████████████████████████████████ █████████████████████ could permit a software or computer engineer to understand how ████ ██████████████████████ (*Id.* ¶¶ 15-16.) The designated Exhibit 23 information contains ███████████████████████████████████████████████, and a competitor could use this information to develop or control SwitchPoint itself or replace Stryker's systems. (*Id.*) Lastly, Exhibit 24 is a design file that provides █████████████████ ██████████████████████████████████████████████ ███████████████████████ that are necessary to understand how to SwitchPoint's software operates. (*Id.* ¶ 20.)

According to Mr. Potts, the designated information in the Set Nine materials could allow a person to develop and patent a system or product that interoperates or control's Stryker's SwitchPoint system. (*Id.* ¶¶ 12, 17, 22.) Thus, counsel reviewing the information could use it to draft, amend, or affect the scope of patent claims relating to central control for systems or devices used in operating rooms. Mr. Potts further avers that disclosure of this designated SwitchPoint information could be further harmful to Stryker because the technology has been used for other products, as well. (*Id.* ¶ 12.)

Mr. Juergens's declaration does not address the Set Nine documents at all. (*See generally* Dkt. No. 172-13.)

United States District Court
Northern District of California

e.      KSEA's Response

As noted above, with respect to Set Six and Seven, Mr. Juergens states only that the materials are common in the industry.  (Dkt. No. 172-13 ¶¶ 60-61.)  But for the reasons explained above, common use in the industry does not mean the specific use in confidential, accused products is known to the public.  As for Set Eight, the Juergens Declaration makes guesses about what information one might or should be able to ascertain without the documents, but makes no affirmative statements.  (*Id.* ¶¶ 63-64.)  Mr. Juergens is silent as to Set Nine, and no other KSEA witness offers testimony about these materials.  The Court therefore accepts as true Mr. Subramanian's representations about the Set Six through Nine materials—generally, that the information is confidential; could not be obtained through reverse engineering, tear downs, or testing; and could allow a competitor to develop products that interoperate with or replace Stryker's products.

KSEA instead argues generally that Stryker mischaracterizes the information in these sets as source code and, even if the source code analogy were apt, urges the Court to only apply the prosecution bar to a specific subset of source code: "trade secret algorithms under research and development and/or directed to future product releases."  (Dkt. No. 172 at 18.)

KSEA's approach is unfounded.  First, KSEA urges the Court to reject Stryker's contentions that much of the designated information is akin to source code because it permits a person to understand how the products' software works.  As a threshold matter, there is no magic phrase that renders information subject to a prosecution bar.  Instead, it is the practical effect of source code that usually triggers such a bar: that it is not otherwise discoverable and permits people to determine exactly how a product functions, and thus poses a high competitive value in the patent prosecution context.  There is no reason to exclude from a prosecution bar information that is *akin* to source code just because it is not actually source code.  If the information is as confidential as source code and presents the same risk—*i.e.*, its disclosure permits people to determine how the product functions and thus enable them to create a competing product or shape ongoing patent prosecution to develop products that interoperate with Styrker's—the same prosecution-bar designation holds true.  *See Deutsche Bank*, 605 F.3d at 1381 (noting that, in

28

contrast to financial data or business information, confidential technical information, *including* source code, is clearly relevant to a patent application and may pose a heightened risk of inadvertent disclosure).

Second, the Court declines KSEA's invitation to limit the prosecution bar to information about technology still in the research-and-development phase or yet-to-be-released products. In KSEA's view, source code falls on a spectrum of low to high value, depending on whether a skilled programmer could replicate the functions after observation or use of a product. (Dkt. No. 172 at 14.) Without deciding whether this is true, the cases on which KSEA relies do not support its position that the information here does not deserve prosecution bar designation.

KSEA's citation to *Robotic Vision Systems, Inc. v. View Engineering, Inc.*, 112 F.3d 1163, 1166 (Fed. Cir. 1997), undermines its position. There, the Federal Circuit explained that disclosing the functions of software is often enough because a skilled programmer can write code based on the functions. *Id.* at 1166. And here, for the reasons explained above, Stryker seeks to maintain the prosecution bar over the designated materials that disclose its software's function for precisely that reason. KSEA's insistence that the functions "can be easily replicated" does not find sufficient support in the Juergens Declaration.

KSEA's reliance on *Davis v. AT&T*, No. 98-CV-0189S(H), 1998 WL 912012, at *2 (W.D.N.Y. Dec. 23, 1998), is equally unavailing. KSEA cites *Davis* as an example of source code at the deserves-protection end of the alleged source code spectrum. There, the court concluded that the defendants were entitled to a provision restricting the plaintiff (not counsel) from accessing defendants' source code regarding their automatic speech recognition technology. *Id.* There is no language in *Davis* suggesting that certain types of source code or source code-like material are less deserving of protection. Instead, the *Davis* court based its conclusion on the risk of economic harm to the defendants—namely, they had expended millions of dollars developing the technology over several years—and the plaintiff's involvement in the same field. *Id.* at *2-3. Applying this rationale here compels the same conclusion: Stryker has spent time and money developing its camera and operating room technology, and KSEA's patent prosecution counsel is involved in the same field, and the particular designated information remains confidential and

29

1    would disclose the way the technology works, thus presenting a risk of competitive harm.

2                                        *  *  *

3        In sum, except for ████████████████ information in STRKS00000552 and

4    STRKS00001329 in the Set Four materials, the highlighted information in Sets One through Nine

5    is confidential, technical information that reveals how the accused products' software operates and

6    risks being used even inadvertently in ongoing patent prosecutions related to the subject matter of

7    this action.  The Court therefore GRANTS Stryker's motion to retain confidentiality designations

8    and concludes that the highlighted information in Exhibits 1 through 24 shall remain subject to the

9    prosecution bar.

10   **II.    Administrative Motions to File Under Seal**

11       There is a presumption of public access to judicial records and documents.  *Nixon v.*

12   *Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978)*.  A party must demonstrate "compelling

13   reasons" to seal judicial records attached to a dispositive motion.  *Kamakana v. City & Cnty. of*

14   *Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006).  Examples of compelling reasons include "the use

15   of court records for improper purposes," such as "to gratify private spite, promote public scandal,

16   circulate libelous statements, or release trade secrets."  *Id.*  "[S]ources of business information that

17   might harm a litigant's competitive strategy" may also give rise to a compelling reason to seal,"

18   *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978), as may pricing, profit, and customer

19   usage information kept confidential by a company that could be used to the company's

20   competitive disadvantage, *see Apple Inc. v. Samsung Elecs. Co.*, 727 F.3d 1214 (Fed. Cir. 2013).

21   The "compelling reasons" standard is a strict one, and "[s]imply mentioning a general category of

22   privilege, without any further elaboration or any specific linkage with the documents, does not

23   satisfy the burden."  *Kamakana*, 447 F.3d at 1184.  The court must "balance the competing

24   interests of the public and the party who seeks to keep certain judicial records secret.  After

25   considering these interests, if the court decides to seal certain judicial records, it must base its

26   decision on a compelling reason and articulate the factual basis for its ruling, without relying on

27   hypothesis or conjecture."  *Id.* at 1179; *see also Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1162

28   (9th Cir. 2011), *cert. denied*, 132 S. Ct. 2374 (2012).

United States District Court
Northern District of California

30

1     In light of a weaker public interest in nondispositive motions—*i.e.*, because the documents

2     may well be unrelated or only tangentially related to the underlying cause of action, the "good

3     cause" standard from Federal Rule of Civil Procedure 26(c) applies when parties wish to keep

4     them under seal.  *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th Cir. 2010).  "[T]he party

5     seeking protection bears the burden of showing specific prejudice or harm will result," *Phillips ex*

6     *rel. Estates of Byrd v. Gen. Motors Co.*, 307 F.3d 1206, 1210-11 (9th Cir. 2006), and must make a

7     "particularized showing . . . with respect to any individual document," *San Jose Mercury News,*

8     *Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096, 1103 (9th Cir. 1999).  "Broad allegations of harm,

9     unsubstantiated by specific examples or articulated reasoning" are insufficient.  *Beckman Indus.,*

10    *Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992).

11    In addition, parties moving to seal documents must comply with the procedures set forth in

12    Civil Local Rule 79-5.  The rule permits sealing only where the parties have "establishe[d] that the

13    document or portions thereof is privileged or protectable as a trade secret or otherwise entitled to

14    protection under the law."  Civ. L.R. 79-5(b).  It requires the parties to "narrowly tailor" their

15    requests only to the sealable material.  *Id.* at 79-5(d).  Thus, although sometimes it may be

16    appropriate to seal a document in its entirety, whenever possible a party must redact.  *See*

17    *Kamakana*, 447 F.3d at 1183 (noting a preference for redactions so long as they "have the virtue

18    of being limited and clear"); *Murphy v. Kavo Am. Corp.*, 11-cv-00410-YGR, 2012 WL 1497489,

19    at *2-3 (N.D. Cal. Apr. 27, 2012) (denying motion to seal exhibits but directing parties to redact

20    confidential information).  Whatever the basis, the court "must articulate [the] reasoning or

21    findings underlying its decision to seal."  *Apple Inc.*, 658 F.3d at 1162.

22    Here, the parties each move to file under seal portions of their motion to retain

23    confidentiality designations and documents filed in support thereof.  All three motions are

24    unopposed.  Stryker's first administrative motion seeks to seal portions of its motion to retain

25    confidentiality designations, Exhibits 1 through 24 to the Carrozza Declaration—*i.e.*, the nine sets

26    of materials at issue in the motion, and portions of the Subramanian and Potts Declarations

27    describing in detail the contents of those exhibits.  (Dkt. No. 164.)  These documents contain

28    confidential, technical information about Stryker's internal design files for the accused products

United States District Court
Northern District of California

31

1  that disclose their structure and operation—information that the parties have designated as highly

2  confidential and some of which the Court has already deemed highly confidential and subject to a

3  patent prosecution bar.  The proposed redactions are narrowly tailored to seal only information

4  that discloses this confidential information.  Accordingly, the motion to seal is GRANTED.

5      KSEA likewise seeks to file under seal portions of its opposition to the motion to retain

6  confidentiality designations, portions of the Juergens Declaration, and Exhibits C, E, and K to the

7  Kosma Declaration.  (Dkt. No. 171.)  These materials disclose or discuss information about

8  Stryker's accused products that Stryker designated as confidential pursuant to the parties'

9  Protective Order.  (*See id.* at 2.)  Pursuant to Civil Local Rule 79-5(e), Stryker has submitted a

10  declaration supporting the appropriateness of the confidential designations.  (Dkt. No. 175.)  The

11  information in Exhibits C, E, and K are design files been designated as "HIGHLY

12  CONFIDENTIAL-ATTORNEYS EYES ONLY" by Stryker because they contain confidential

13  technical information about the design and operation of Stryker's video camera and operating

14  room technology.  (*Id.* ¶ 2.a.)  The highlighted portions of the Juergens Declaration refer to and

15  describe in detail the contents of Exhibits 1 through 24 to the Carrozza Declaration in support of

16  Stryker's motion to retain confidentiality designation, which the Court has already deemed

17  properly sealable, as discussed above.  The highlighted portions of the opposition refer to the

18  above-mentioned confidential materials.  (*Id.* ¶ 2.c.)  The proposed redactions are narrowly

19  tailored to seal only information that discloses this confidential information.  The motion to seal is

20  therefore GRANTED.

21      Lastly, Stryker seeks to seal portions of its reply in support of its motion to retain

22  confidentiality designations.  (Dkt. No. 177.)  The highlighted portions of the reply likewise

23  discuss and quote documents that the Court deemed sealable in connection with the initial motion

24  or KSEA's opposition.  Good cause therefore exists to seal the requested portions, which are

25  narrowly tailored to seal only information that discloses this confidential information.  The motion

26  to seal is therefore GRANTED.

                                    **CONCLUSION**

27

28      For the reasons described above, the Court GRANTS IN PART Stryker's motion to retain

United States District Court
Northern District of California

32

1   confidentiality designations.  Stryker may retain its prosecution bar designation over all material

2   except for █████████████████ information set forth in STRKS00000552 and

3   STRKS00001329 in the Set Four materials.  In addition, the Court GRANTS the parties'

4   administrative motions to file under seal.

5          The Court files this Order under seal because various matters referenced herein have been

6   filed under seal in this matter.  However, the Court is not persuaded that the entirety of this Order

7   is confidential or properly sealable.  Accordingly, on or before June 1, 2016, the parties shall file a

8   statement setting forth which portions of this Order they contend must be filed under seal with

9   citations to the facts and law supporting their position for each and every proposed redaction.

10  Failure to file such a statement will result in unsealing of this Order in its entirety.

11         This Order disposes of Docket Numbers 164, 165, 171, and 177.

12         **IT IS SO ORDERED.**

13  Dated: May 23, 2016

14

15

16  JACQUELINE SCOTT CORLEY
    United States Magistrate Judge

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

33