Alfredo A. Bismonte (Cal. Bar. No. 136154)
BECK, BISMONTE & FINLEY, LLP
150 Almaden Blvd, 10th Floor
San Jose, CA 95113
Tel: (408) 938-7900
Fax: (408) 938-0790
Email: abismonte@beckllp.com

Wesley W. Whitmyer Jr. (*pro hac vice*)
Michael J. Kosma (*pro hac vice*)
Stephen Ball (*pro hac vice*)
Robert D. Keeler (*pro hac vice*)
Christopher J. Stankus (*pro hac vice*)
Benjamin N. Luehrs (*pro hac vice*)
WHITMYER IP GROUP LLC
600 Summer Street
Stamford, Connecticut 06901
Tel: (203) 703-0800
Fax: (203) 703-0801
Email: litigation@whipgroup.com
mkosma@whipgroup.com
sball@whipgroup.com
rkeeler@whipgroup.com
cstankus@whipgroup.com
bluehrs@whipgroup.com

Attorneys for Plaintiff,
Karl Storz Endoscopy-America, Inc.

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| KARL STORZ ENDOSCOPY-AMERICA, INC., <br><br><br> Plaintiff, <br><br> v. <br><br> STRYKER CORPORATION and STRYKER COMMUNICATIONS, INC., <br><br><br> Defendants. | Case No. 3:14-CV-00876-RS <br><br> **KSEA'S OPPOSITION TO STRYKER'S MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF ERIC BEAR** <br><br> **Date: September 19, 2018** <br><br> **Time: 10:00 a.m.** <br><br> **Courtroom: #3, 17th Floor** <br><br> **Hon. Richard Seeborg** |

REDACTED DOCUMENT SOUGHT TO BE FILED UNDER SEAL

## **Table of Contents**

I.   Introduction ........................................................................................................ 1

II.  Stryker Does Not Identify any Deficiency Under FRE 702, But Simply Argues a
     Difference of Opinion With Respect to the Definition Of a POSITA ..................... 1

     A.  Although it Need Not be Resolved Now, Mr. Bear Qualifies as a POSITA Even
         Under Stryker's Definition ........................................................................ 2

     B.  Stryker Cites No Authority for Excluding an Expert Based on a Disputed
         Definition .................................................................................................. 5

     C.  Mr. Bear's Definition Appropriately Addresses Interface Design and His
         Testimony Will Help the Jury Understand Context of the '420 Patent and
         Stryker's Prior Art ................................................................................... 8

     D.  There is No Need to Resolve the Definition of a POSITA Now, Which Would
         Improperly Supplant the Jury in Its Obviousness Determination ............... 10

III. A Presumption Applies to the Secondary Considerations in Mr. Bear's Opinions ............... 11

     A.  Nexus is Presumed as the Products are Co-Extensive with the Claims ..................... 12

     B.  Each Secondary Consideration Has Been Supported by Sufficient Facts ................. 15

         1.  Copying ................................................................................................ 15

         2.  Commercial Success ............................................................................ 15

         3.  Long-felt, but Unsolved Need .............................................................. 17

         4.  Industry Praise .................................................................................... 18

IV.  Conclusion ........................................................................................................ 18

# Table of Authorities

**Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
738 F3d 960 (9th Cir. 2013) ............................................................................. 1

*Apple Inc. v. ITC*,
725 F.3d 1356 (Fed. Cir. 2013) ....................................................................... 16

*Chemfree Corp. v. J. Walter, Inc.*,
No. CIV. 1:04-CV-3711JTC, 2008 WL 4845107 (N.D. Ga. Oct. 2, 2008), aff'd, 468 F.
App'x 983 (Fed. Cir. 2012) ............................................................................... 6

*City of Pomona v. SQM N. Am. Corp.*,
750 F.3d 1036 (9th Cir. 2014) ........................................................................... 1

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ........................................................................................... 1

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
851 F.2d 1387 (Fed. Cir. 1988) ....................................................................... 16

*Disney Enters., Inc. v. Kappos*,
923 F. Supp. 2d 788 (E.D. Va. 2013) ................................................................ 6

*Ecolab USA Inc. v. Diversey, Inc.*,
No. 12-CV-1984-SRN-FLN, 2015 WL 2353018 (D. Minn. May 15, 2015) ......... 14

*Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*,
533 F.3d 1353 (Fed. Cir. 2008) ....................................................................... 11

*Emerson Elec. Co. v. Suzhou Cleva Elec. Appliance Co.*,
No. 4:13-CV-1043-SPM, 2015 WL 5768572 (E.D. Mo. Sept. 30, 2015) ............... 7

*Extreme Networks, Inc. v. Enterasys Networks, Inc.*,
395 F. App'x 709 (Fed. Cir. 2010) ..................................................................... 7

*Flex-Rest, LLC v. Steelcase, Inc.*,
455 F.3d 1351 (Fed. Cir. 2006) ......................................................................... 6

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
676 F.3d 1063 (Fed. Cir. 2012) ....................................................................... 17

*In re GPAC Inc.*,
57 F.3d 1573 (Fed. Cir. 1995) ......................................................................... 14

*Intellectual Ventures I LLC v. Canon Inc.*,
36 F. Supp. 3d 449 (D. Del. 2014) ................................................................... 18

*Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*,
392 F.3d 1317 (Fed. Cir. 2004) ....................................................................... 14

*Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*,
No. 09-CV-1685, 2013 WL 6230484 (M.D. Pa. Dec. 2, 2013) ......................... 14

*K-Tec, Inc. v. Vita-Mix Corp.*,
2010 WL 1417862, *1 (D. Utah 2010), aff'd, 696 F.3d 1364, 1374 (Fed. Cir. 2012) ........... 11

*Lambda Optical Solutions, LLC v. Alcatel-Lucent USA Inc.*,
No. 10-CV-487-RGA-CJB, 2015 WL 12806435 (D. Del. July 25, 2015) ............ 16

*Moleculon Research Corp. v. CBS, Inc.*,
793 F.2d 1261 (Fed. Cir. 1986) ....................................................................... 11

*Morpho Detection, Inc. v. Smiths Detection, Inc.*,
   957 F.Supp.2d 655 (E.D. Va. 2013) ................................................................ 14

*Pfizer Inc. v. Teva Pharms. USA, Inc.*,
   460 F. Supp. 2d 659 (D. NJ 2006) ................................................................ 14

*Polaris Indus., Inc. v. Artic Cat, Inc.*,
   882 F.3d 1056 (Fed. Cir. 2018) ...................................................... 12, 13, 17

*Presidio Components Inc. v. Am. Tech. Ceramics Corp.*,
   723 F.Supp.2d 1284 (S.D. Cal. 2010) ............................................................ 7

*Primiano v. Cook*,
   598 F.3d 558 (9th Cir. 2010) ........................................................................ 1

*Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*,
   75 F.3d 1568 (Fed. Cir. 1996) ..................................................................... 12

*Ruiz v. A.B. Chance Co.*,
   234 F.3d 654 (Fed. Cir. 2000) ..................................................................... 11

*SEB S.A. v. Montgomery Ward & Co., Inc.*,
   594 F.3d 1360 (Fed. Cir. 2010) ..................................................................... 7

*Seed Research Equip. Solutions, LLC v. Gary W. Clem, Inc.*,
   No. 09-01282-EFM-KGG, 2011 WL 5024351 (D. Kan. 2011) ........................... 7

*Sloan Valve Co. v. Zurn Indus., Inc.*,
   No. 10-CV-00204, 2013 WL 6068790 (N.D. Ill. Nov. 18, 2013) .......................... 6

*Tec Air, Inc. v. Denso Mfg. Michigan Inc.*,
   192 F.3d 1353 (Fed. Cir. 1999)................................................................... 16

*Tesco Corp. v. Weatherford Intern. Inc.*,
   750 F.Supp.2d 780 (S.D. Tex. 2010) ............................................................. 8

*WBIP, LLC v. Kohler Co.*,
   829 F.3d 1317 (Fed. Cir. 2016).................................................................. 12

*Williamson ex rel. At Home Bondholders' Liquidating Tr. v. Verizon Commc'ns Inc.*,
   No. 11 CIV. 4948 LTS HBP, 2012 WL 5425033 (S.D.N.Y. Nov. 7, 2012). ........... 6

*Wisconsin Alumni Research Foundation v. Apple, Inc.*,
   135 F.Supp.3d 865 (W.D. Wis. 2015) ................................................ 11, 15, 16

*Wyers v. Master Lock Co.*,
   616 F.3d 1231 (Fed. Cir. 2010).................................................................. 15

**Rules**

Fed. R. Evid. 702 ............................................................................................. 1, 2

1

## I.    <u>Introduction</u>

Plaintiff Karl Storz-Endoscopy America, Inc. ("Plaintiff" or "KSEA") submits this Opposition to Defendants Stryker Corporation and Stryker Communications, Inc.'s (collectively, "Defendants" or "Stryker") Motion to Exclude Mr. Bear, ("Motion" or "Mot.", Dkt. 438).

Expert testimony is admissible so long as: (1) it will "assist the trier of fact" either "to understand the evidence" or "to determine a fact in issue"; and (2) the witness is sufficiently qualified to render the opinion. FED. R. EVID. 702; *Primiano v. Cook*, 598 F.3d 558, 563 (9th Cir. 2010); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The requirement to "assist" the fact-finder goes primarily to relevance. *See Primiano*, 598 F.3d at 564. The test for admissibility is "not the correctness of the expert's conclusions but the soundness of his methodology." *See id*. The district judge acts as "'a gatekeeper, not a fact finder.'" *See id*. at 564-65. "The judge is 'supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.'" *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (quoting *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)). "Shaky but admissible evidence is to be attacked on cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *See Primiano*, 598 F.3d at 563. So long as the foundation for an opinion is sufficient, the party proffering the expert testimony is entitled to have the jury, not the judge, decide the expert's credibility. *Id*. at 566.

Stryker's arguments attack the merits of Mr. Bear's opinions, not admissibility. Stryker merely presents arguments on substantive issues purely from its own perspective. There is no legal basis to exclude Mr. Bear from offering contrary opinions. For the reasons stated below, Stryker's motion should be denied.

## II.    <u>Stryker Does Not Identify any Deficiency Under FRE 702, But Simply Argues a Difference of Opinion With Respect to the Definition Of a POSITA</u>

Stryker's baseless arguments that Mr. Bear has "no relevant experience" are not only untrue, but Stryker never even alleges Mr. Bear's testimony will not help the jury. Expert testimony is admissible when the expert has "specialized knowledge" that will help the trier of

fact. FED. R. EVID. 702. Stryker fails to identify any deficiencies in Mr. Bear's proffered testimony. Instead, Stryker advocates its own definition of a POSITA and then concludes Mr. Bear is not qualified under this unilateral definition. As acknowledged by Stryker, Mr. Bear has "impressive credentials" and brings relevant interface design experience. (Mot. at 17.) At most, Stryker has identified a dispute regarding the definition of a POSITA that will be resolved by the jury as part of the obviousness determination.

### A. Although it Need Not be Resolved Now, Mr. Bear Qualifies as a POSITA Even Under Stryker's Definition

The Court should reject Stryker's arguments because Mr. Bear qualifies as a POSITA even under Stryker's definition. The definition element Stryker alleges is missing is two years of experience "in the design of medical devices."[1,2] Mr. Bear has significantly more than two years of such experience. He listed this experience in his *curriculum vitae* and identified it during his deposition, yet Stryker never asked him about it. Following is a sampling from Mr. Bear's distinguished career.

From approximately 1996 to 1999, Mr. Bear designed a suite of products (including medical devices) for Chiron Informatics. (Bear Dec.[3] ¶ 6.) This included multiple handheld medical devices. (Bear Dec. ¶¶ 6-10.) One product was called PromptChart, the first web-based HIV disease management product available for physicians and patients. (Bear Dec. ¶ 6.) PromptChart created, organized and managed a longitudinal database of critical patient data and presented that information in disease specific clinical views for physicians to develop more effective treatment strategies. (Bear Dec. ¶ 6.) PromptChart decreased the time required to review critical laboratory values by providing concise visual tools to track longitudinal changes in relevant markers, such as viral load and CD4. (Bear Dec. ¶ 7.) PromptChart provided patient-

---

[1] The other elements of Stryker's definition are duplicative. Two years of experience in the design of medical devices would seem to also provide "immersion in" and "exposure to" that industry, as well "an understanding" of human factors involved.

[2] Stryker takes great effort *not* to define "medical device." Based on Mr. Walbrink's report, it appears it is any device used in the medical field. (*See, e.g.,* Dkt. 380-4 "Walbrink" at 122 (identifying a printer as a type of medical device).)

[3] "Bear Dec" refers to the Declaration of Eric Bear filed concurrently herewith.

specific reminders and alerts based on physician treatment guidelines, which spanned the continuum from prophylaxis treatment recommendations through reminders of routine test needs and vaccines. (Bear Dec. ¶ 7.) PromptChart was licensed to Bayer in 2000 as part of Chiron Informatics' sale of Chiron Diagnostics to Bayer. (Bear Dec. ¶ 8.) Chiron Informatics was acquired by Novartis International AG in 2006. (Bear Dec. ¶ 8.) While working with Chiron Informatics, Mr. Bear gained experience with medical environments and personnel while deploying products to medical clinics, as well as analyzing roles, workflows, and in-situ requirements through interviews and research. (Bear Dec. ¶¶ 8-10.) Although Mr. Bear testified that he designed products for Chiron Informatics, Stryker never asked him about this experience during his deposition. (Bear Tr. 175:4-17.)

From approximately 1999 to 2001, Mr. Bear designed of a suite of products (including medical devices) for Fast Track Systems, a leading provider to pharmaceutical R&D organizations. (Bear Dec. ¶ 11.) This included clinical trial planning software and proprietary contracting data using handheld touchscreen medical tablet devices in order to improve efficiencies in protocol development and trial planning, contracting, and negotiation. (Bear Dec. ¶ 11.) Fast Track was purchased by Medidata Solutions in 2008. (Bear Dec. ¶ 11.) Its innovative clinical trial planning tools are now integrated into software systems available from Medidata Solutions. (Bear Dec. ¶ 11.) Although Mr. Bear testified that he designed products for Fast Track Systems, Stryker never asked him about this experience during his deposition. (Ex. F, "Bear Tr." at 175:4-17.)

From approximately 2005-2006, Mr. Bear designed touch-screen based products (medical devices) for Luminex Corporation. (Bear Dec. ¶ 12.) This included graphical user interfaces for the operation of a suite of devices for configuring and analyzing batches of blood samples using proprietary xMAP Technology. (Bear Dec. ¶ 12.) Luminex's xMAP Technology combined advanced fluidics, optics, and digital signal processing with proprietary microsphere technology to deliver multiplexed assay capabilities. (Bear Dec. ¶ 12.) Like with other projects, his work with Luminex Corporation involved understanding workflow requirements of medical

1   staff interacting with medical devices, as well designing interfaces for to ensure efficiency and

2   accuracy in the operating environment. (Bear Dec. ¶ 12.) Although Mr. Bear testified that he

3   designed products for Luminex Corporation, Stryker never asked him about this experience

4   during his deposition. (Bear Tr. 175:4-17.)

5       From approximately 2006-2009, Mr. Bear led projects for e-MDs' medical practice

6   solutions. (Bear Dec. ¶ 13.) This involved interviewing doctors, medical assistants and nurses,

7   watching them go about their everyday routines of visiting with patients and managing their

8   respective medical practices (including interactions with the medical devices on which e-MDs'

9   software was installed, for example, entering and retrieving clinical data). (Bear Dec. ¶ 13.)

10  Based on this detailed workflow understanding and failure-point assessment, Mr. Bear led the

11  redesign of e-MDs' Solution Series product user interfaces to improve treatment capabilities and

12  establish clinical best practices that enhance patient-clinician relationships. (Bear Dec. ¶ 13.)

13  Independent industry and physician surveys consistently rank e-MDs' solutions among the top-

14  rated electronic health record and practice management systems. (Bear Dec. ¶ 13.) Although Mr.

15  Bear testified that he designed products for e-MDs, Stryker never asked him about this

16  experience during his deposition. (Bear Tr. 175:4-17.)

17      Not only did Stryker not ask Mr. Bear about his experience, but Stryker misrepresents

18  Mr. Bear's deposition testimony. For example, Stryker states "Mr. Bear did not even know where

19  the claimed touchscreen would be placed during use in an operation." (Mot. at 18.) The actual

20  testimony follows:

21          Q. Okay. Fair enough. If the system of Claim 3 were set up in an
            operating room for minimally invasive surgery, where would the
22          touchscreen be located?

23          MR. BALL: Objection. Form.

24          A. The touchscreen would ideally be located in easy reach for a
            human operator.

25          Q. Would it matter whether or not the touchscreen were located in
            a sterile field?
26
            A. I -- I can't say one way or the other. It depends on who the
27          operator is and what role they're playing in the OR.

28  (Bear Tr. 149:21-150:9.) That Stryker did not get the answer it wanted to its incomplete

hypothetical is irrelevant. Worse, Stryker then states that Mr. Bear "guessed wrong" about FDA requirements. No such question was ever presented to Mr. Bear, which would have also been irrelevant. Mr. Bear did testify that placement depends on the particular context. (*Id.*) Indeed it is unclear what point Stryker is trying to make with its still incomplete hypothetical, because it never takes a position where the touch panel could or could not be placed in its hypothetical.[4] (Mot. at 19.) These mischaracterizations are simply desperation from Stryker.

What is important to understand is that designers of interfaces approach many different usage environments and determine the best way to design an interface that addresses the desired objectives. (Bear Dec. ¶¶ 5, 14-17.) Stryker cites Mr. Bear's testimony, where he states a POSITA "would not have had to have training or experience designing systems for healthcare *in the past*." (Mot. at 13 (citing Bear Tr. 212:1-16) (emph. added).) The industry is not specific, as designers can "parachute" into any industry and familiarize themselves with design requirements. (Bear Dec. ¶ 15.) Each usage environments can have different objectives and motivations that lead to different interfaces. (Bear Dec. ¶ 15.) In addition to having done this here (Dkt. 442-62, "Bear Rep." at A-D, documents referenced), as well as prior cases, Mr. Bear has significant experience designing medical devices. (Bear Dec. ¶¶ 4-15.) As Stryker points out, Mr. Bear's definition of a POSITA has withstood the test of time, having been used in numerous cases across various industries, and has never been successfully challenged. (Bear Dec. ¶ 15 n.4.)

**B. Stryker Cites No Authority for Excluding an Expert Based on a Disputed Definition**

Stryker fails to identify legal support, much less factual support, for supplanting the jury and ruling on the definition of a POSITA now. Stryker relies on two unpublished decisions from other districts and a nonprecedential decision form the Federal Circuit. (Mot. at 7-8, 18.) None of these cases support Stryker's request for the exclusion of Mr. Bear's testimony.

In *Sloan Valve* the court defined a POSITA as a person having "*some* experience designing, assembling, and/or repairing plumbing systems or devices" after the moving party "presented credible evidence that design experience is required." *Sloan Valve Co. v. Zurn Indus.,*

---

[4] In fact, Mr. Walbrink states in his report that safety standards are "not part of the subject matter of claim 3." (Walbrink at 83.)

*Inc.*, No. 10-CV-00204, 2013 WL 6068790, at \*5, \*6 (N.D. Ill. Nov. 18, 2013) (emph. added). The court then excluded an expert that did "not have ***any*** experience in plumbing systems or devices." *Id.* at \*7 (emph. added). Here, Stryker has not explained how any alleged lack of skill or expertise prevents Mr. Bear from assisting the jury, nor has Stryker submitted "credible evidence" that a POSITA requires two years of "medical device" design. *Sloan Valve* notes that "[i]n defining the art, courts should, however, 'narrow[ ] the art to focus on the context of the inventor's problem.'" *Sloan Valve Co.*, 2013 WL 6068790, at \*4 (citations omitted). As discussed *infra*, the '420 patent discloses a user interface "that is simpler to use and permits quicker execution than present systems for controlling devices," (Dkt. 442-11, " '420 patent' 1:55-62), and Mr. Bear's proffered testimony is directed to this very context.

Likewise, the court in *Williamson* excluded an expert who had ***no*** experience: "[he] holds no technical degree, has never completed coursework in any technical field, and has never actually designed computer networks…he was unable, at his deposition, to describe basic networking principles." *Williamson ex rel. At Home Bondholders' Liquidating Tr. v. Verizon Commc'ns Inc.*, No. 11 Civ. 4948 LTS HBP, 2012 WL 5425033, at \*2 (S.D.N.Y. Nov. 7, 2012). Again, such extreme circumstances are not applicable here. *See Disney Enters., Inc. v. Kappos*, 923 F. Supp. 2d 788, 799 (E.D. Va. 2013) (noting limited applicability of *Williamson* and other cases with "vastly more attenuated relationships between the expertise of the purported experts and the field of the inventions").

The Federal Circuit's ***nonprecedential*** ruling in *Extreme Networks* is similarly unavailing.[5] *Extreme Networks, Inc. v. Enterasys Networks, Inc.*, 395 F. App'x 709 (Fed. Cir.

---

[5] Stryker also cites *Flex-Rest, LLC v. Steelcase, Inc.*, 455 F.3d 1351 (Fed. Cir. 2006), which other courts have noted had very little analysis or guidance. *See Chemfree Corp. v. J. Walter, Inc.*, No. CIV. 1:04-CV-3711JTC, 2008 WL 4845107, at \*3 (N.D. Ga. Oct. 2, 2008), aff'd, 468 F. App'x 983 (Fed. Cir. 2012) ("the Federal Circuit did not hold in *Flex–Rest* that an expert cannot testify when that expert has no practical experience in the technology involved in the patents-in-suit. Rather, the Federal Circuit concluded—after very little discussion—that 'there is no indication that the district court abused its discretion' in concluding that Flex–Rest's expert was 'not one of ordinary skill in the art at the time of the invention.' In addition, unlike *Flex–Rest*, this is not a situation where Defendants' expert has no practical experience in the

2010). In that case, the parties were in agreement on a POSITA's background and the court

found the proffered expert "would not qualify as a person of ordinary skill in the relevant art

even under her own proposed definition." *Id*. at 715. This is not the case here and Stryker does

not dispute that Mr. Bear qualifies under his own definition (he also qualifies under Stryker's,

discussed *infra*).

Stryker has failed to identify any persuasive authority for the drastic relief of excluding

Mr. Bear. To the contrary, ***even an expert who lacks the literal qualifications of a POSITA is***

***still competent to offer testimony*** when the expert has "sufficient relevant technical experience."

*SEB S.A. v. Montgomery Ward & Co., Inc.*, 594 F.3d 1360, 1373 (Fed. Cir. 2010) ("Although he

testified that he is not skilled in designing deep fryers, Mr. Van Horn explained that his

experience was relevant..."); *Presidio Components Inc. v. Am. Tech. Ceramics Corp.*, 723 F.

Supp. 2d 1284, 1293 (S.D. Cal. 2010) ("[A]lthough Dr. Ewell does not meet the requirement

agreed to by the parties that a person qualified in the art 'would have at least two years of

industry equivalent in designing multilayer capacitors,' Dr. Ewell clearly has 'sufficient relevant

technical experience.'"), *aff'd in part, vacated in part on other grounds*, 702 F.3d 1351 (Fed. Cir.

2012). Stryker simply disagrees with Mr. Bear's opinions and its arguments go to weight, not

admissibility. *Seed Research Equip. Solutions, LLC v. Gary W. Clem, Inc.*, No. 09-01282-EFM-

KGG, 2011 WL 5024351, *2–*4 (D. Kan. 2011) ("The case law indicates that where a proposed

expert has relevant knowledge but does not necessarily meet the pre-defined appropriate level of

skill, courts typically admit the expert's testimony and then consider any deficiencies in the

expert's qualifications in determining what weight to give the testimony in the claim

technology involved in this case.") (internal citation omitted); *Emerson Elec. Co. v. Suzhou
Cleva Elec. Appliance Co.*, No. 4:13-CV-1043-SPM, 2015 WL 5768572, at *3 (E.D. Mo. Sept.
30, 2015) ("In *Flex–Rest* and *Khoury*, there was no indication that the experts at issue had any
technical experience in product design or any experience with the type of technology at issue;
they were described only as experts in 'ergonomics.' Here, in contrast, Dr. Rutter has extensive
experience in product design, including experience with consumer vacuum cleaner design.
Moreover, given the lack of discussion of reasons and the abuse of discretion standard used in
*Flex–Rest* and *Khoury*, those cases provides little guidance for the Court."). In any event, the
expert "***was allowed to testify to his field of expertise***." *Flex-Rest*, 455 F.3d at 1356 (emph.
added).

construction process. Simply put, shortcomings are considered for weight, rather than admissibility.") (internal citations omitted); *Tesco Corp. v. Weatherford Int'l Inc.*, 750 F. Supp. 2d 780, 795-96 (S.D. Tex. 2010) (refusing to strike technical expert since expert had engineering experience relevant to dispute and the expert's lack of a specialization in field only went to weight of testimony).

Stryker has failed to identify authority supporting exclusion, and the prevailing law actually goes the other way—Mr. Bear has specialized knowledge that will help the trier of fact and should be permitted to testify.

### C. Mr. Bear's Definition Appropriately Addresses Interface Design and His Testimony Will Help the Jury Understand Context of the '420 Patent and Stryker's Prior Art

Mr. Bear's definition of a POSITA appropriately takes into account "interface design" as the '420 patent sought "to provide a way of interfacing with all of the imaging devices available for the procedure that is simpler to use and permits quicker execution than present systems for controlling devices." ('420 patent 1:55-62.) Importantly, ***Stryker does not identify any deficiencies in Mr. Bear's analysis*** "essential to offering a valid, reliable expert opinion which will aid the factfinder."[6] Instead, Stryker simply offers its own definition of a POSITA confined to design of "medical devices"—which it never even defines—and in doing so seeks to deprive the invention of its context.

Mr. Bear's experience and expertise will be helpful to educate the jury on the "myriad user interface visualization and interaction techniques known to be employable when creating new user experiences." (Bear Rep. ¶ 44.) "[T]he invention is concerned with operating room technologies for accomplishing speed in human video switching interactions, accuracy of human video switching interactions, and a minimum of human error in video switching interactions." (Bear Rep. ¶ 46.) "Understanding the '420 Patent depends upon understanding the field of the invention – which is the science of human-computer interaction ('HCI'), also known as user experience ('UX') design – as applied in the context of video switching in a mission critical

---

[6] Stryker's arguments about PTAB proceedings have no relevance here, (Mot. at 14-15), nor has Stryker identified any legal support for their relevance.

KSEA'S OPPOSITION TO STRYKER'S MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF ERIC BEAR

operating room environment." (Bear Rep. ¶ 45.) As described by Mr. Bear, "[g]reat user experiences occur to end-users as simple and easy to use, quick and efficient, seamless and effortless – but these are often the most difficult to formulate. Getting the user experience right is also essential for mission critical tasks, where people's lives or life savings are at stake." (Bear Rep. ¶ 50.) "The claimed invention solves technical problems of speed, precision, and usability with prior GUI [graphical user interface] tools." (Bear Rep. ¶ 54.)

Mr. Bear's proffered testimony appropriately considers this context, which is not limited to the design of "medical devices." (Bear Dec. ¶ 5.) For example, Mr. Walbrink relies on the Salandro reference, which Stryker argues in its brief is "analogous prior art." (Mot. at 15 n.4.) Salandro is directed to a video switching device and never uses the word "medical." (Ex. J.) In addition, Mr. Walbrink relies on the "RGB Spectrum Manual" reference, directed to a "multi-window display processor", as well as the Howell reference, directed to videoconferencing. (Dkt. 168-3; Ex. K.) Neither of these references mention the word "medical" either. Mr. Walbrink also discusses "background" graphical user interfaces such as Microsoft DOS, Xerox Star, Apple MacIntosh, and Microsoft Windows 1.0, as well as touch panel technologies such as Magnavox Plato IV Student Terminal, Hewlett-Packard HP-150, Casio PB-1000, and PalmPilot. (Walbrink at 18-21.) None of these are for the design of "medical devices." Despite this, Stryker and Mr. Walbrink argue these teachings render the claimed invention obvious. In support of his obviousness conclusion, Mr. Walbrink opines that one of KSEA's witnesses "analogized the '420 patent to an aircraft cockpit, which illustrates my point." (Walbrink at 43.) As appreciated by Stryker and Mr. Walbrink, the context of the invention is not limited to medical devices.[7]

Although Mr. Bear has significant experience designing medical devices, his experience—and the experience of a POSITA—should not be limited to such a narrow field. Importantly, Stryker has not explained *why* a POSITA would need two years of experience

_____

[7] Stryker and Mr. Walbrink inexplicably use the analogy of a flock of geese, which is also not "medical device"-related. (Dkt. 442 at 27.)

KSEA'S OPPOSITION TO STRYKER'S MOTION TO EXCLUDE OPINIONS AND
TESTIMONY OF ERIC BEAR

designing "medical devices" to understand the issues in this case.[8] In any event, a POSITA with appropriate interface design experience is able to frame design issues for different contexts, whether in the medical field, aviation, or video conferencing. (Bear Dec. ¶¶ 14-15.) In contrast, Mr. Walbrink has a limited skillset that impacts his analysis. For example, Mr. Walbrink opines that that the Howell reference discloses destination icons, but Mr. Bear correctly identifies them as source icons. (Bear Rep. ¶ 84.) Mr. Bear notes that Mr. Walbrink "fails to provide specific and objective supporting facts and reasoning why a POSITA would combine the alleged prior art references" but instead "merely copies and pastes the same broad and generalized conclusory sections." (Bear Rep. ¶ 89.) Mr. Bear also notes that Mr. Walbrink's proposed deformations of interfaces "would have horrifying usability consequences." (Bear Rep. ¶¶ 95, 106.) Mr. Bear further identifies areas throughout Mr. Walbrink's report where he fails to appreciate how systems function, recognize usability goals, or simply confuses things. (*See, e.g.,* Bear Rep. ¶¶ 71-74, 97, 100, 105, 111, 116, 121-122, 125, 131, 136-137, 140.) Mr. Walbrink—and his definition of POSITA—are simply too narrow and, as a result, a POSITA under that definition (including Mr. Walbrink) does not appreciate the nuanced understanding of human factors that enables efficacy of a system. (Bear Dec. ¶¶ 14, 18.)

Mr. Bear's testimony appropriately considers interface design in explaining the objectives and capabilities of both the claimed invention and the cited art, which will be helpful for the jury.[9] (Bear Dec. ¶¶ 3-5, 14-19.) Stryker fails to explain how Mr. Bear's analysis is deficient, and never even alleges it will be unhelpful to the jury.

### D. There is No Need to Resolve the Definition of a POSITA Now, Which Would Improperly Supplant the Jury in Its Obviousness Determination

Stryker's attempt to take the obviousness determination away from the jury is improper. The disputed definition of a POSITA is part of the jury's obviousness determination. *Eisai Co.*

---

[8] Mr. Walbrink's POSITA definition appears to have been created for the '821 patent, which is directed to controllers for safety- and non-safety related devices. Despite the different foci of the '821 and '420 patents, Mr. Walbrink uses the same POSITA definition for both patents.

[9] Mr. Walbrink even testified during his deposition that he enjoyed Mr. Bear report. (Dkt. 400-14, Walbrink Tr. (Vol. I) 69:14-19 ("As I think Mr. Bear pointed out, he had quite an extensive - - he attached some articles which I enjoyed reading to the back of his report...").)

*Ltd. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1356 (Fed. Cir. 2008) ("The factual determinations underpinning the legal conclusion of obviousness include…the level of ordinary skill in the art."); *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 666 (Fed. Cir. 2000) ("The determination of the level of ordinary skill in the art is an integral part of the *Graham* analysis."). Stryker's arguments are a flagrant attempt to support its obviousness case, (*see, e.g.,* Mot. at 8-12), and Stryker identifies no legal justification for removing this factual dispute from the jury.

Moreover, there is no practical need to rule on the issue now. There are no obviousness arguments on Summary Judgment that require determining the definition of a POSITA.[10] Although KSEA has moved for Summary Judgment on infringement, it is submitted that a POSITA under any definition finds infringement by simply comparing the accused SPI3 product to claim 3 of the '420 patent. *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1270 (Fed. Cir. 1986) (court can rule without expert testimony) *abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008) (en banc); *K-Tec, Inc. v. Vita-Mix Corp.*, 2010 WL 1417862, *1 (D. Utah 2010), aff'd, 696 F.3d 1364, 1374 (Fed. Cir. 2012) ("The court does not need expert testimony to assist it in comparing the claims of the K-TEC patents to the XP Container."). Accordingly, the Court can still rule on Summary Judgment without making a determination on the definition of a POSITA.

## III.    A Presumption Applies to the Secondary Considerations in Mr. Bear's Opinions

Mr. Bear's testimony regarding secondary considerations of non-obviousness should be presented to the jury. The existence of secondary considerations is an issue of fact, *Wisconsin Alumni Research Found. v. Apple, Inc.*, 135 F.Supp.3d 865, 876 (W.D. Wis. 2015) ("Whether [Plaintiff's] evidence alone is sufficient—for the jury to find copying for purposes of secondary considerations of non-obviousness or willful infringement—is an open question, but the court is in no position to exclude evidence of copying or [Plaintiff's] argument to that effect at this point."), as is the existence of a nexus between the secondary considerations and the claimed

---

[10] KSEA has moved for Summary Judgement on the two anticipatory references, (Dkt. 437), on the bases they are not anticipatory (do not have all claim elements) and that Stryker has not shown that they qualify as prior art.

invention. *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1331 (Fed. Cir. 2016) (stating that issues of nexus are "highly fact-dependent"); *see also Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1574 (Fed. Cir. 1996) ("It is within the province of the fact-finder to resolve these factual disputes regarding whether a nexus exists between. . . [secondary consideration] . . . and [a product's] patented features . . .").

Mr. Bear has opined—based on sufficient evidence and data—that secondary considerations exist and have a nexus to the invention embodied in claim 3 of the '420 patent. Stryker alleges that Mr. Bear fails to provide any bases for his opinions or, in the alternative, that Mr. Bear's bases are insufficient. Stryker is wrong. The secondary considerations addressed in Mr. Bear's report are sufficiently supported, and the nexus between each consideration and the claimed invention *is presumed*. Stryker's mere attorney argument to the contrary (much of which focuses on nexus) is aimed ***at the weight*** of the evidence, not its admissibility, and Stryker fails to rebut the presumption and supporting evidence. Thus, at minimum, fact issues regarding secondary considerations exist and must be resolved by the jury.

## A. Nexus is Presumed as the Products are Co-Extensive with the Claims

A presumption of nexus applies to every secondary consideration of non-obviousness presented "when the patentee shows that the asserted objective evidence is tied to a specific product and that product is the invention disclosed and claimed in the patent." *WBIP,* 829 F.3d at 1329 (internal quotations omitted); *id.* at 1330 n.4 (presumption applies to each secondary consideration); *Polaris Indus., Inc. v. Arctic Cat, Inc.,* 882 F.3d 1056, 1071 (Fed. Cir. 2018) (presumption of nexus applies when objective evidence is "tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" (quoting another source)). Nexus is presumed in this case because KSEA's OR1® and Stryker's SPI3 are "co-extensive" with claim 3 of the '420 patent. Indeed, these products are "coextensive" with the claim 3 because the claim is directed to a ***system*** for controlling the communication of medical imaging data, not merely "a component of a commercially successful machine." *Polaris*, 882 F.3d at 1073 (finding accused produce—a vehicle—"coextensive" with claims that "broadly

cover the *entire* vehicle, rather than only a component of a commercially successful machine." (internal quotation omitted) (emph. in original)).

Mr. Bear states in his report that KSEA's OR1® practices each element of claim 3 of the '420 patent. (Bear Rep. ¶ 24 (referencing "brochure demonstrating that KSEA's OR1 instrumentalities practice the claimed invention" (citing Ex. G, KS009427); *cf.* Bear Tr. 70:25-71:11 ("[T]o honestly make a statement that . . . KSEA's OR1 instrumentalities practiced the claimed invention, . . . I would have performed the analysis of comparing claim by claim, limitation by limitation, Claims 1, 2, and 3 of the '420 patent against . . . that brochure. And if I had not, I couldn't make [that] statement . . . ."). Likewise, Mr. Bear also opines that SPI3 "embodies the claimed invention of the '420 Patent." (Bear Rep. ¶ 143 (relying in part on the expert report of Mr. Keller, which is incorporated by reference into Mr. Bear's report); Bear Tr. 107:19-21).

Stryker attempts to discredit Mr. Bear's analysis on the basis he did not include a claim chart in his expert report. However, Mr. Bear testified many times that he completed an element-by-element analysis of each product. (*See, e.g.,* Bear Tr. 47:9-67:2, including 47:18-48:6, 48:16-25; 50:6:25 ("A.   It sounds like you're asking me the same question over and over again."); 59:17-60:3.) He also assessed Mr. Keller's report, which further articulates infringement and is incorporated by reference in Mr. Bear's report. (Bear Tr. 107:19-21.) In any event, no claim chart is required for the presumption of nexus to apply. *See Polaris*, 882 F.3d at 1073 (patentee and expert met required analysis for presumption of nexus when expert reviewed patent and literature associated with products at issue, compared products to claims, and determined that products embodied each element recited in claims); *see also id.* at n.7 (rejecting that either a limitation-by-limitation or documentary evidence is required for presumption of nexus to apply). Mr. Bear's analysis, in which he compared claim 3 with OR1 and SPI3, "limitation by limitation," is sufficient to establish a presumption of nexus as to each secondary consideration on which he opines. (Bear Tr. 107:19-21); *WBIP,* 829 F.3d at 1330 n.4 (presumption applies to each secondary consideration). Moreover, Mr. Bear is not required to submit a claim chart. *See*

*Morpho Detection, Inc. v. Smiths Detection, Inc.*, 957 F. Supp. 2d 655, 674 n.22 (E.D. Va. 2013) (rejecting that patent owner "was required by law" to provide claim by claim infringement analysis for its own product); *Ecolab USA Inc. v. Diversey, Inc.*, No. 12-CV-1984-SRN-FLN, 2015 WL 2353018, at *6 (D. Minn. May 15, 2015) (plaintiffs "were not required to provide a claim-by-claim analysis of [plaintiff's product]"). Thus, at minimum, Mr. Bear's opinion that OR1® and SPI3 practice the claimed invention is sufficient evidence of nexus, separate from and in addition to the presumption.

　　　　Stryker does nothing to sever the presumption of nexus or rebut the evidence presented in Mr. Bear's report. Even if Stryker had made such a showing, a complete lack of nexus does not preclude testimony because nexus goes to the weight of testimony, not admissibility. *Pfizer Inc. v. Teva Pharms. USA, Inc.*, 460 F. Supp. 2d 659, 664 (D. N.J. 2006) ("[T]he Court also notes that the Federal Circuit has not found that the lack of such nexus evidence warrants preclusion. ***In such cases, courts simply accord little weight to the licensing evidence; they do not preclude its admission altogether***.") (emph. added). Indeed, accused infringers frequently make such "lack of nexus" arguments as a purported basis for excluding expert testimony related to secondary considerations, and courts routinely reject it. *See, e.g., id.; Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, No. 09-CV-1685, 2013 WL 6230484, at *3-4 (M.D. Pa. Dec. 2, 2013).` In fact, the cases cited by Stryker do not even hold that a lack of nexus requires exclusion. *See Iron Grip Barbell Co., Inc. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004) (addressing weight of evidence, not exclusion of testimony, and providing that existence of licenses was of "***little*** significance" even when finding that there was "no [] evidence of a nexus" (emph. added)); *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) (finding attribution of "little weight" evidence of licensing and commercial success when nexus requirement not satisfied, and further providing that "***[t]o the extent*** that the patentee demonstrates the required nexus, his objective evidence of nonobviousness will be accorded more or less weight" (emph. added); *cf. Pfizer*, 460 F. Supp. 2d at 664. Accordingly, the Court should not exclude Bear's testimony, but submit it to a jury.

**B. Each Secondary Consideration Has Been Supported by Sufficient Facts**

Stryker alleges (without support) that Mr. Bear's report is devoid of facts to support his opinions regarding secondary considerations. Even if Stryker was correct (it is not), the Court still should not exclude Mr. Bear's testimony because Stryker's arguments concern the weight of evidence, not admissibility. Accordingly, the Court should deny Stryker's motion to exclude and let the jury determine what weight secondary considerations may be afforded in the face of Stryker's obviousness challenge. *Wisconsin Alumni*, 135 F. Supp. 3d at 876.

     1.   <u>Copying</u>

Stryker alleges that Mr. Bear "has no factual foundation to establish that KSEA's products practice the claimed invention of the '420 patent, much less that Stryker copied those claimed features." (Mot. at 20.) As explained above, Mr. Bear testified that he performed an element by element analysis when preparing his report, leading him to opine that Stryker's SPI3 and KSEA's OR1® embody claim 3 of the '420 patent. (Bear Tr. 70:25-71:11.) Mr. Bear performed this same analysis for products of third-parties Steris and Global Device Management. (Bear Tr. 110:17-35, 121:1-7.) Thus, there is no basis to exclude Mr. Bear's testimony for lack of foundation.

In addition, Stryker admits that copying can be shown by "access to the patented product combined with substantial similarity to the patented product." (Mot. at 20 (citing *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1346 (Fed. Cir. 2010).) Mr. Bear testified about this. (Bear Tr. 100:13-18 ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

*see also, e.g.,* Ex. H, STRKS00052021 at 27-30, 81-82 █████████████████████████

██████████ (cited in the expert report of Mr. Keller).) Accordingly, the facts underlying Mr. Bear's report are more than sufficient to demonstrate copying.

     2.   <u>Commercial Success</u>

Mr. Bear's report provides sufficient facts for him to opine on commercial success of the claimed invention, which is embodied in OR1® and SPI3. For example, Mr. Bear cites the report of KSEA's damages expert, Mr. Bernatowicz, which shows KSEA and Stryker are by far the

largest suppliers of operating room integrated systems. (*See, e.g.,* Dkt. 422-69 "Bernatowicz" Ex. 11); *Lambda Optical Solutions, LLC v. Alcatel-Lucent USA Inc.*, No. 10-CV-487-RGA-CJB, 2015 WL 12806435, at *9 (D. Del. July 25, 2015) (success of an infringing product considered to be evidence of the commercial success of the claimed invention). U.S. sales alone for SPI3 are more than sufficient to support this. (*See* Bernatowicz Ex. 4 (showing invoices for SPI3 of nearly ▇▇▇▇▇▇ between 2013 and 2017).); *see also Tec Air, Inc. v. Denso Mfg. Michigan Inc.*, 192 F.3d 1353, 1360–61 (Fed. Cir. 1999) ("[S]ales figures alone are also evidence of commercial success"). Mr. Bear further understood that Mr. Bernatowicz broke out patented and non-patented features in his analysis. (Bernatowicz at 47-48; Ex. 15; Bear Tr. 79:7-14 ("[I]t's my understanding from Mr. Bernatowicz' report that a commercial ex- -- success of both Stryker's and KSEA's systems came together, in part due to the patented features.").) A jury must determine what weight to give Mr. Bear's opinions. *Wisconsin Alumni*, 135 F. Supp. 3d at 876.

In addition, Mr. Bear opines that patented features drive KSEA's relationship with customers, and the relationship drives sales. (Bear Tr. 88:1-5 ("It's the patented features that drive the relationship, and the relationship drives the sales. They're interrelated and – and actually not distinct components in my opinion.").) Stryker questioned Mr. Bear about this very analysis, and Mr. Bear highlighted exemplary circumstances in which customers specifically requested the features. (Bear Tr. 88:9-93:6 (discussing, among other examples, customer specifically requesting KSEA's new icon user interface)); *see also Apple Inc. v. Int'l Trade Comm'n,* 725 F.3d 1356, 1366 (Fed. Cir. 2013) (evidence of copying and industry praise demonstrate nexus between commercial success and claimed invention).

Stryker next argues that Mr. Bear states no opinion regarding whether a claimed feature, an unclaimed feature, or a feature that was known in the prior art drove any alleged commercial success. (Mot. at 21.) However, Mr. Bear was not required to provide such determinations. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1394 (Fed. Cir. 1988) ("A patentee is not required to prove as part of its prima facie case that the commercial success of the patented invention is not due to factors other than the patented invention. It is sufficient to show

that the commercial success was of the patented invention itself."). Instead, this is Stryker's

burden, and Stryker's mere attorney argument fails to rebut KSEA's prima facie case. *Polaris*,

882 F.3d at 1072 ("[A] patent challenger cannot successfully rebut the presumption with

argument alone—it must present evidence."); *In re Cyclobenzaprine Hydrochloride Extended-

Release Capsule Patent Litig*., 676 F.3d 1063, 1078 n.5 (Fed. Cir. 2012) ("The burden of

establishing invalidity of a patent or any claim thereof shall rest on the party asserting such

invalidity" and in the case of objective indicia, the patentee merely has a "discovery obligation"

that "do[es] not change the fact that the party challenging validity bears the burden of persuasion

throughout the litigation"). Here, Stryker has done nothing to rebut or discredit Mr. Bear's

opinions regarding commercial success. Accordingly, the Court should therefore refrain from

excluding his testimony.

### 3.    Long-felt, but Unsolved Need

The invention in claim 3 of the '420 patent solved a long-felt need in the industry.

Stryker's own expert admitted this in his expert report. (*See, e.g.,* Walbrink at 39.[11]) However,

not only is the long-felt need established by Mr. Walbrink's report, Mr. Walbrink cites patents

*filed in the early 1980s and mid-1990s to establish the existence of this need leading up to the

patented invention*. (*See* Walbrink at 39 (citing Ex. I, U.S. 6,646,541 filed August 6, 1996, Ex. J,

U.S. 5,144,548 filed July 13, 1989). KSEA's other evidence, including statements in Stryker's

510(k) and in the patent itself provide further bases. (Bear ¶ 146; *passim*); *FastShip, LLC v.

United States*, 131 Fed. Cl. 592, 620 (Fed. Cl. 2017) (finding statements in patent specification to

be evidence of long-felt need).

These are more than sufficient bases for Mr. Bear's opinion on long-felt need and

---

[11] "[A]t the time of the alleged invention of the '420 patent, *there was a recognized* need in the art to solve the problem of how to provide a user interface that is the most intuitive and least confusing. This included the problem of how to enhance ergonomics of the user interface, to improve work flow by organizing the controls in a convenient manner (or to provide a logical flow), to enhance the aesthetic appearance of the interface, and to improve the efficiency of use, which may reduce confusion and eliminate the potential for errors in routing data.) Stryker argues that KSEA cannot utilize another expert's testimony when the expert is opining on a claimed invention being 'obvious to try.' " (emph. added).

1  Stryker's arguments go to weight, not admissibility. While Stryker disagrees with these opinions,

2  "this type of disagreement is more properly the fodder for vigorous cross-examination."

3  *Intellectual Ventures I LLC v. Canon Inc.*, 36 F. Supp. 3d 449, 473 (D. Del. 2014), *new trial*

4  *granted*, 104 F. Supp. 3d 629 (D. Del. 2015). The Court should find similarly here, as Stryker's

5  arguments go to weight, not admissibility, and mere attorney argument about the weight of

6  evidence should not preclude Mr. Bear's testimony.

7             4.    Industry Praise

8             Finally, Mr. Bear opines that industry leaders like The Mayo Clinic and UCLA, as well

9  as market research firms like iData Research, all touted praise for the claimed invention. (Bear

10  Rep. ¶¶ 148-149.) Again, Stryker disagrees as to the weight of this evidence, which is separate

11  from admissibility. Evidence of industry praise weighs against an assertion that the claimed

12  invention would have been obvious. Thus, this issue should be decided by the fact finder.

13  **IV.  Conclusion**

14             For the foregoing reasons, the Court should find that Stryker has failed to meet its burden

15  of showing that the opinions and testimony of Mr. Bear should be excluded.

16                                    Respectfully Submitted,

17

18  DATED: <u>August 23, 2018</u>              /s/ Alfredo A. Bismonte

19                                    Alfredo A. Bismonte (Cal. Bar. No. 136154)
                                      BECK, BISMONTE & FINLEY, LLP
20                                    150 Almaden Blvd, 10th Floor
                                      San Jose, CA 95113
21                                    Tel: (408) 938-7900
                                      Fax: (408) 938-0790
22                                    Email: abismonte@beckllp.com

23                                    Wesley W. Whitmyer Jr. (*pro hac vice*)
                                      Michael J. Kosma (*pro hac vice*)
24                                    Stephen Ball (*pro hac vice*)
                                      Robert D. Keeler (*pro hac vice*)
25                                    Christopher J. Stankus (*pro hac vice*)
                                      Benjamin N. Luehrs (*pro hac vice*)
26                                    WHITMYER IP GROUP LLC
                                      600 Summer Street
27                                    Stamford, Connecticut 06901
                                      Tel: (203) 703-0800
28                                    Fax: (203) 703-0801

Email:  litigation@whipgroup.com
mkosma@whipgroup.com
sball@whipgroup.com
rkeeler@whipgroup.com
cstankus@whipgroup.com
bluehrs@whipgroup.com

Attorneys for Plaintiff,
Karl Storz Endoscopy-America, Inc.